**GENERAL BRONZE CORP. v. CUPPLES PRODUCTS CORP. et al.**

Nos. 6216, 6619.

United States District Court
E. D. Missouri, E. D.

May 22, 1950.

See also, D.C., 9 F.R.D. 269.

Haynes & Koenig, Delos G. Haynes and Lloyd R. Koenig, St. Louis, Mo., Curtis, Morris & Safford, Daniel L. Morris and Marshall M. Holcombe, New York City, for plaintiff.

Thomas S. McPheeters, Marion S. Francis, and Joseph J. Gravely, St. Louis, Mo., Casper W. Ooms, Chicago, Ill., for defendants.

HULEN, District Judge.

These two suits for trial were consolidated.[1] Plaintiff sues for infringement of seven patents, putting in issue twenty claims. Unfair competition is charged.

The patents concern certain aspects of double hung aluminum window structure combinations; improvement in structural features or appurtenances to aluminum windows. Decision on the main issues, factual, turn on the questions: (1) has there been infringement by defendants, and (2) are the allegedly infringed patent claims legal patents under prior art. There are technical defenses as to certain patents in the case.

The facts of this case originate in the Spring of 1946. Plaintiff had long manufactured, except for the war years, aluminum windows. Plaintiff developed many patents through Edmond Peremi and Louis Fath. Defendant Moran was plaintiff's sales manager and an officer in some of its subsidiary corporations. Defendant Weimann was employed in the experimental and development department. Wilson was Moran's assistant, handling sales correspondence.

Early in 1946 the corporate defendants became interested in manufacturing aluminum windows. A sample was constructed. While still employed by plaintiff, Moran went to corporate defendants to discuss going with them to promote the manufacture and sale of aluminum windows. The defendants Moran, Weimann and Wilson.[2] met with representatives of defendant in New York in March of 1946. Defendants, after careful investigation, hired them, subject to obligations and contracts with plaintiff. As soon as the contracts with plaintiff permitted, the personal defendants commenced work for the corporate defendants and have been closely associated with the production and sale of the accused window structures ever since. The first sale by defendants was made in March, 1947.

Although plaintiff was aware of defendants' activities and the participation of the personal defendants therein, no word of complaint was ever lodged by plaintiff with either of the defendants until this suit, for infringement of the Peremi patents, was filed in December, 1948.

In ruling on the issues we make a preliminary observation of certain general rules of law. The issuance of a patent is prima facie evidence of novelty and utility. The burden rests on plaintiff to establish infringement. The burden is on defendants to demonstrate illegality of patent claims. Reasonable doubts must be resolved in favor of the claim for which patent was issued.

The circumstances of this case invoke certain additional rules of law. Every claim refers in terms to a combination, asserted to effect an improvement. The claims are drawn with apparent effort to avoid their destruction when faced with

1. Case No. 6619 for infringement of Patent 2,473,298 was filed subsequent to case No. 6216. Letters patent in case 6619 were issued July 14, 1949, after case 6216 was filed.

2. Herein referred to as personal defendants.

the prior art. An art admittedly old and crowded. Aluminum windows have been on the market for twenty years. The extrusion art is over forty years old.

Plaintiff, anticipating attack based on prior art, would have a strict interpretation placed on the prior art. To that end attention is called to the case of Dewey & Almy Chemical Co. v. Mimex Co., 2 Cir., 1942, 124 F.2d 986, 989. There the Court said: "No doctrine of the patent law is better established than that a prior patent or other publication to be an anticipation must bear within its four corners adequate directions for the practice of the patent invalidated. If the earlier disclosure offers no more than a starting point for further experiments, if its teaching will sometimes succeed and sometimes fail, if it does not inform the art without more how to practice the new invention, it has not correspondingly enriched the store of common knowledge, and it is not an anticipation."

■ Plaintiff seems to recognize the closeness of the prior art on some of the "elements" in the Peremi patents. It would escape the effect of prior art by resort to such authorities as Ottumwa Box Car Loader Co. v. Christy Box Car Loader Co., 8 Cir., 1914, 215 F. 362, 369, an opinion by Judge Sanborn of this Circuit, holding: "It constitutes no anticipation and no defense to a claim of infringement that one or more elements of a patented combination, or one or more parts of a patented improvement, may be found in one old patent or publication, and others in another, and still others in a third. It is indispensable that all of them, or their mechanical equivalents, be found in the same description or machine, where they do substantially the same work by the same means."

The statute governing the subject cannot be ignored on some claims. Its use is illustrated in the case of Cuno Engineering Corp. v. Automatic Devices Corp., 314 U. S. 84, 90, 62 S.Ct. 37, 40, 86 L.Ed. 58: "We may concede that the functions performed by Mead's combination were new and useful. But that does not necessarily make the device patentable. Under the statute, 35 U.S.C. § 31, 35 U.S.C.A. § 31, R.S. § 4886, the device must not only be

'new and useful', it must also be an 'invention' or 'discovery'. Thompson v. Boisselier, 114 U.S. 1, 11, 5 S.Ct. 1042, 1047, 29 L.Ed. 76. Since Hotchkiss v. Greenwood, 11 How. 248, 267, 13 L.Ed. 683, decided in 1851, it has been recognized that if an improvement is to obtain the privileged position of a patent more ingenuity must be involved than the work of a mechanic skilled in the art." . (Citations omitted.)

■■ See the case of Trico Products Corp. v. Delman Corporation, 8 Cir., 1950, 180 F.2d 529, to the effect that the ruling of the Supreme Court has raised the standard of originality necessary to sustain patents for improvements in an old art, regardless of the usefulness of the device. "Patents * * * which join old and well-known devices with the declared object of achieving new results, or patents which add an old element to improve a pre-existing combination, easily lend themselves to abuse. And to prevent extension of a patent's scope beyond what was actually invented, courts have viewed claims to combinations and improvements or additions to them with very close scrutiny." Halliburton Oil Well Cementing Co. v. Walker, 329 U.S. 1, 67 S.Ct. 6, 11, 91 L. Ed. 3.

To achieve patent—"More must be done than to utilize the skill of the art in bringing old tools into new combinations." Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 89, 62 S.Ct. 37, 40, 86 L.Ed. 58.

■ And finally the recognized rule, as stated by the Court for this Circuit. See Tropic-Aire, Inc., v. Sears, Roebuck & Co., 8 Cir., 1930, 44 F.2d 580, 588: "The question, however, as to whether there was any patentable invention in claims 6 and 7, in view of the prior art, cannot be passed by. Try as we may, we cannot convince ourselves that Caesar did anything more than to use ordinary mechanical skill in connecting a Modine Unit to the hot water cooling system of an automobile. He mounted a small Modine heater inside of an automobile and attached it to the water supply system thereof so as to perform the same function in heating the automobile space that it would perform in heating any

928

other space. That this was a new thought may be conceded, but new thoughts which merely involve the working out of mechanical skill to produce a result are not patentable."

And one by the Supreme Court. In Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 1145, 89 L.Ed. 1644, the Court ruled: "A long line of cases has held it to be an essential requirement for the validity of a patent that the subject-matter display 'invention', 'more ingenuity * * * than the work of a mechanic skilled in the art.' * * * This test is often difficult to apply; but its purpose is clear. Under this test, some substantial innovation is necessary, an innovation for which society is truly indebted to the efforts of the patentee. Whether or not those efforts are of a special kind does not concern us. The primary purpose of our patent system is not reward of the individual but the advancement of the arts and sciences. Its inducement is directed to disclosure of advances in knowledge which will be beneficial to society; it is not a certificate of merit, but an incentive to disclosure. See Hartford-Empire Co. v. United States, 323 U.S. 386 [432, 433], 65 S.Ct. 373, at page 395 [89 L.Ed. 322]. Consequently it is not concerned with the quality of the inventor's mind, but with the quality of his product."

 As bearing on some of our observations we will here call attention to the statute on requirements of the patent application. It shall be—"in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same;" and further—"shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery." Title 35 U.S.C.A. § 33.

Throughout the trial plaintiff relied heavily on showing an application of words constituting the claims to the accused structures. Resort to this practice led the Court to comment on its bearing on the issue in some instances. The true test of infringement, aided by a comparison of terms, must remain substantial identity. Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136.

In the light of these rules of law we pass to the claims. We will endeavor to rule as they require.

(Case 6619)
Patent 2,473,298

Plaintiff charges infringement of Claim 4 of patent 2,473,298 by defendants' A–100 window. The patent is one in which defendant Weimann joined in the application as inventor. Mr. Weimann executed application for the patent at the request of plaintiff after he became an employee of defendant Cupples Products Corporation.

Claim 4 is directed to the combination effecting use of a brake or equalizer, and reads as follows: "4. In a window construction of the type having a frame member including vertical jambs having channels for receiving a slidable sash member, a sash member having horizontal upper and lower rails and vertical side rails which latter are slidably mounted in said channels; the improvement which includes a plate member mounted on the upper side of the upper horizontal rail, a screw attaching said plate member to said rail, an arm carried by said plate member and having slidable contact with a face of the adjacent jamb member, and an adjusting screw operatively associated with said plate for adjusting said arm toward and in contact with said face of said jamb, said screw including a tool-receiving head located outside of the adjacent channel in which said sash member is mounted so as to be freely accessible for engagement by a tool when said sash is mounted in said frame."

Double-hung windows covered by the claim and defendants' accused structure use a spring mounted in the channel of the sash instead of the old conventional rope and sash weight to counterbalance and retain window in desired position. When the windows are moved the tension of the spring cannot be depended on to hold the window in a fixed position because the greater the movement the more tension on the spring—hence the desirability of a brake to hold the window in position.

The basic part of plaintiff's device is a "plate" on the "upper side of the upper horizontal rail" of the sash member. This plate with its extending "arm" to contact the "adjacent jamb" and thereby furnish brake by friction with jamb turns as a pivot on a "screw", the pivot resulting from turning of a set screw on the face of the rail. When the plate is turned the "arm" on the plate is caused to come in contact with one side of the jamb member, or release contact, if turned in opposite direction, braking power or equalization depending on adjustment of the screw.

The accused structure obtains the same results as set forth in Claim 4 of plaintiff's patent; namely brakes or equalizes the window sash.

While defendants' accused structure furnishes a brake and accomplishes the same result as plaintiff's, and is attached to the same sash member in the same relative position, and brakes by friction with the jamb, resemblance there ends between the two devices. They operate an entirely different principle to obtain the same result. The prime or basic part of plaintiff's brake is the flat plate that turns or pivots on a set screw. Defendants' device operates on an entirely different principle. There is no pivot. An angle part is fixed to the rail. It does not move. A part of this piece by virtue of the angle extends upward. Horizontally over the upper part of this angle part is a U shaped part. The ends of the U fit into the jamb member. A screw turning free at and in the base of the U and into the angle part regulates the friction. As the base of the U part is forced toward the angle piece by tightening the operative screw, the two ends of the U are forced outward in contact with each side of the jamb resulting in breaking power. Loosen the set screw, the ends of the U release their friction or braking power.

We must be guided by the claim of plaintiff's patent in determining infringement. The substantial operating parts of plaintiff's patent do not resemble defendants' accused device in appearance or operation. Substantial identity in the two brakes is not apparent on full exposure. Plaintiff's patent is claimed to be an improvement in the art of equalizers or brakes for window sash. Even a liberal construction of Claim 4 does not bring defendants' device into the field of infringement of Claim 4. Unless we hold that plaintiff has a monopoly on any braking device attached to the top of the top rail of the lower sash and is affixed to the rail in any manner by a screw. This we do not propose to do. Nor can we follow plaintiff in its insistence that the plate that pivots on its devices has any substantial resemblance to the U of defendants' brake. Plaintiff may call them both plates but if they do, then the answer must be—there are plates and plates and they do not all look alike. The same results may be obtained by both equalizers but they are obtained by substantially different mechanisms.

We do not believe that any one seeing plaintiff's device would find in it a suggestion for defendants' device, and vice versa.

Plaintiff has failed to establish that the accused structure of defendants' brake or equalizer infringes Claim 4 of Patent 2,473,298.

In view of our conclusion on infringement we do not deem it necessary to pass on questions of prior public use or estoppel on this claim.

(Case 6216)

Reissue 23,045

Patent 2,077,807

The infringement charge involves claims 1 and 2 in connection with windows A–100, A–200 and A–500. The device to which the claims are directed represents a clip for holding panes of glass in place in a window sash and is useful in windows of all types. Claim 1 reads as follows: "In a window the combination with a sash, glass in the sash, said sash having dovetailed grooves adjacent the glass at one side thereof, clips holding the glass in the sash, each clip comprising a relatively long leg caught in the dovetail groove, a resilient loop interposed between the sash and the edge of the glass, and a relatively short leg engaging the face of the glass, and putty keyed in

the dovetailed grooves, covering and concealing the clips, and engaging the glass."

And Claim 2 (broader than claim 1 by. omitting description of clip found in claim 1) reads as follows: "In a window the combination with a sash, glass in the sash, said sash having dovetailed grooves adjacent the glass at one side thereof, putty keyed in the dovetailed grooves and engaging the glass, and clips anchored in the dovetailed grooves embedded in the putty and engaging the glass."

What is said regarding claim 1 applies to claim 2. We will treat the two claims under one head. Plaintiff's brief refers only to claim 1.

In inserting glass in window sash or glazing, the problem was originally presented of holding the glass in place in the sash while putty was being applied and while the putty was drying and holding the glass in the sash in event the putty cracked loose in time. Various clip designs resulted for holding the glass in the sash. There are many patents on the subject.

The two features of plaintiff's patent which are stressed are a sash rail with a dovetail groove around the sash rail, and a resilient loop in the clip, which plaintiff represents "so co-act with each other in such manner that the window glass at its edges is yieldably supported so that it. will not have direct and positive contact with the sash, and so that yieldable pressure is exerted on the face of the glass to hold it in place."

That the two features named are the main substantive elements of the claim is further emphasized by plaintiff in its brief: "Cooperating with this particular form of window sash with the undercut or dovetail grooves 47 are the glazing clips which hold the glass in the sash. Each of these clips includes a long leg 48 which is engaged in the dovetail groove at 47. At the end of this leg adjacent the glass the clip is bent to form a resilient loop 49 which is interposed between the edge of the glass and the adjacent face of the sash rail. * * * Thus the glass is cushioned at all four of its edges in spaced relation to the sash rails, and its weight is yieldably supported at the bottom by the resilient loops 49 in the clips at the bottom of the sash."

The exact part played by these two "coacting" features is further stressed: "when the weight of the glass is exerted against the loop portion of the clip which resiliently supports the glass, it will tend to raise the free end of the long leg of the clip from engagement with the flange at 47. But this movement is prevented by the undercut or dovetail groove. Also, pressure on the short leg by the movement of the glass under wind pressure, for instance, would have the same tendency to move the end of the long leg upwardly and again it would be prevented by the undercut or dovetail groove at 47."

With the result: "So there is a very definite cooperation between the particular form of clip which has a long leg and a short leg with the interposed loop, with the undercut or dovetail groove which holds the clip in place against displacement under actual conditions of use and which clip would not be held in place in proper position but for the undercut groove."

It is precisely these two substantial features of plaintiff's patent, which plaintiff urges to the exclusion of any other, that are missing in the accused structures of defendants. It will not do for plaintiff to argue that Weimann admitted defendants' clip has a resilient loop and other features of plaintiff's clip. A reading of his testimony is contrary. Any one looking at the drawings can see the difference.

True the glass rests on the clip in defendants' device but the "resilient loop" is missing. This is a material and substantial variance, sufficient in itself to destroy infringement. But there is an absence of the dovetail in defendants' structure. Plaintiff's claim is reasonably to be interpreted as describing that the end of the "relatively long leg", composed of a round or flat fiting, goes into dovetail. The term "caught" is used in the claim. In the accused structure it is plainly shown that a long leg lays in a rounded groove. This is a substantial and material difference, not a "difference which does not

amount to a distinction". We find no infringement.

 When we go to the prior art a variety of clips are found which in our opinion cover the principal and substantial features of the clips of both plaintiff and defendants. The Kinnear patent, No. 1,-073,805 (1913), represents a clip where the glass rests on a loop which we presume to be resilient to some extent. The short leg of the Kinnear patent holding the glass is very similar to that of plaintiff's clip. If the long leg of the Kinnear patent were arched and anchored in a recess or dovetail it would be hard to distinguish it from plaintiff's clip. The Kane patent, No. 1,-023,938, (1912) does have the long leg of the clip anchored in a groove. The same is true of Sweet's 1917–689; Sweet's 1924–25–891; also Kane's patent No. 1,000,413 and Kane's Patent 1,001,147.

While plaintiff may have changed the anchors of the ends of the clips shown in the prior art to some extent, its clip does not show invention or discovery under applicable law. In our opinion plaintiff's clip simply represents in its substantive and material features, use and application of similar or like features of the prior art.

We hold plaintiff's patent 23,045 claims 1 and 2 invalid for lack of invention.

There is a serious question bearing on this patent, as to whether it meets the statutory test of clarity. Note this testimony of Mr. Keulemans, a witness for plaintiff, as to deductions to be made from the drawing; and they are not aided any by the description.

"Q. And as you read that drawing, it could mean either what I have assumed to be a flat strip of metal under the loop under the glass, or it could be a wire shape, shown in figure two, but with a leg, which is not shown, running parallel to the edge of the glass pane, or it may be two legs of wire of the shape shown with some kind of connection between the two so it has breadth? A. That is right."

We do not rule this question in view of our holding on infringement and validity.

### Patent 2,077,808

This patent involves use of the same clip as discussed under Reissue patent 23,405 but is directed to the combination of elements forming the muntin of a window sash. Claim 7 is in issue and reads: "In a window, in combination, a muntin bar of T form, the cross of the T forming pane seats and the stem of the T having short divergent flanges at opposite sides thereof which point toward the pane seats and define retaining notches or grooves and means interlocked with the retaining notches for holding the panes in place.

What we said under the preceding heading need not be repeated here. We pass to the claim as presented.

 A short answer to this claim is that, the "short divergent flanges at opposite sides thereof [of the T] which point toward the pane seats and define retaining notches of grooves" is not in the accused structure of the defendant. Also the retaining notches or grooves ("means interlocked with the retaining notches holding the panes in place") are not in the accused structure. Taking the claim as written or extending it to the combination of the clip, we can find no infringement. With this finding, together with a comparison of plaintiff's claim with the prior art such as Kane patent 1,000,413 (1911); Kane patent 1,023,938 (1912); Kawneer patent, Sweet's Catalog 1924–25, 891; each of which shows "short divergent flanges at opposite sides thereof [of the T] which point toward the pane seats and define retaining notches of grooves and means interlocked with the retaining notches holding the panes in place"—we reach the same conclusion as to validity, and for the same reasons, as in case of patent Reissue 23,045.

### Patent 2,084,355

Plaintiff charges infringement of eight claims under Patent 2,084,355.

### Claim 11

This claim reads as follows: "In a window of the double hung type, a frame, including a jamb member, said jamb mem-

ber comprising extruded sections shaped to form a channel for the reception of a sash, the extruded member at one side of said channel being formed to provide a pocket having an open side, the edges of the pocket along the margins of said opening being undercut, and a folded, resilient metal weather-stripping member mounted in said pockets and retained by said undercut portions, thereby providing a sealing joint and a rattle proof sash construction."

We find very little specifically on Claim 11 in defendants' briefs. In connection with other claims it does set forth: "This patent is directed to three window features. The first is shown in Fig. 4 and is, broadly speaking, the combination of the jamb with pockets in which weatherstrips are mounted, and the side rail or stile of the sash. Claims 11, 21, 22, 29 and 30 are directed to this phase of the invention of this patent."

and "So the testimony of Mr. Jorss shows beyond peradventure that none of the art to which he referred discloses the combination of elements including the pocket with the undercut or overhanging flange for protecting the edge of the weather strip, as recited in claims 21 and 29 that have been analyzed above, or as recited in claims 11, 21 and 30, and since the specific construction which has been used by both plaintiff and defendants commercially admittedly produces advantageous results in this type of window, the claims are valid."

It is obvious that plaintiff is directing its claim particularly to the "pocket" with an "open side", in one side of the channel of the window jamb and this pocket having the "edges" along "the margins of the said opening * * * undercut", into which fits a "folded, resilient weather strip" and which is retained by the "undercut" edges of the pocket.

The accused structure of defendants does not even suggest the device or structure described in Claim 11 of plaintiff's patent. Defendants' jamb member, the form of its weather strip and its contact with the sash differs materially from plaintiffs, in design, appearance and function. Where plaintiff uses a small U designed weather strip trapped in the "pocket" in the jamb, defendants' weather strip rides in the channel of the jamb, it fits in no pocket but is secured to the base of the jamb by screws and in general follows the walls of the jamb channel and gives a double seal to the weather strip and sash and causes the sash to ride in the weather strip, with equal contact on each side of the sash with the weather strip.

Plaintiff's Claim 11 finds a close counterpart in the Stein patent, No. 1,688,836. In the Stein patent we find the weather strip contacting one side of the sash only; also the weather strip is in a pocket (without the undercut) on one side of the jamb and contacts the sash by virtue of its resiliency.

The Dreher patent, No. 1,791,808, relating to a casement window, shows a weather strip trapped in a groove and retained because the edges of the pocket along the margins of said opening "being undercut" and the strip is "retained by said undercut portion". The principle of a weather strip held in position by a "pocket" by reason of the edges "being undercut" is well illustrated in Sweet's Catalog. See Michaels Art Bronze, Sweet's 1930, A–871, and McCoy Bronze Co., Sweet's 1926–27, A–722.

Defendants' structure bears more fully on Miller patent 1,691,490, in that the weather strip follows the jamb contour and contacts both sides of the sash projection. The slot of the jamb receiving the sash member of the Miller patent is suggestive of plaintiff's device.

It is our conclusion plaintiff's Claim 11 is illegal because of lack of invention. It represents nothing more than a skilled mechanic might develop with knowledge of the prior art.

### Claim 17

Claim 17 under patent 2,084,355 goes to the combination of particular elements of the lower rail of the lower sash with respect to form and arrangement of weather strip. An undercut groove is made on the bottom of the lower rail of the sash and into this groove a resilient sheet of metal forming the weather strip is mounted. The top "leg" of the strip is firmly seated in

the undercut groove and the other "leg" constitutes the resilient sealing member by coming in contact with the window sill when the window is down. An inner projecting flange holds the weather strip in place and seals the opening when the window is open. Claim 17 reads as follows: "A sash for a double hung window including a bottom rail member comprising a hallow extruded shape, the bottom wall thereof having an undercut groove formed therein, and a weatherstrip comprising a folded sheet of resilient metal, one leg of which is firmly seated in the said undercut groove, and the other leg of which constitutes a resilient sealing member, said bottom rail member having inner and outer downwardly projecting flanges between which said weather-strip is located, the outer of said flanges being wider than the inner flange and having a shoulder thereon adapted to be engaged by the free edge of the resilient leg of said weather-strip member when the window is open."

Infringement is charged against the defendants' A–100 and A–200 windows.

On page 102 of plaintiff's brief, referring to defendants' structure, it is said: "The weather strip is generally of V-form and has one leg firmly seated in the undercut groove or channel between the flanges 14 and 15 and the other resilient leg engaging the sill when the lower sash is lowered."

The weather strip of defendants' accused structure is not firmly seated in the "undercut groove" at the bottom of the lower rail of the window as that of plaintiff under Claim 17. The resilient side of the weather strip of both plaintiff and defendants is held in place when the window is open by an inner projecting flange but defendants' structure does not have "one leg of which [the weather strip] is firmly seated in the said undercut groove", nor does defendants' structure have "the bottom wall thereof * * * an undercut groove formed therein". The elements of plaintiff's structure covered by the last two quotations from Claim 17 are substantial.

▮ Defendants' strip is held in the space for the weather strip at the bottom of the window by a different mechanical principle. The strip is the width of the space provided for retaining with a leg on each side thus holding the strip. The absence from the accused structure of the features referred to are not merely colorful. We find their absence a substantial and important one and destroys any basis for the infringement charged. Defendants have not adopted the substance of the element in an equivalent.

While plaintiff's strip is "firmly" held in place, that of defendants is free in the groove to move and find its place when the window is up and down.

The prior art shows the principle of entrapping a weather strip in the lower sash rail is old. The Lane patent, No. 1,663,134, reveals the principle of holding a weather strip in position in the bottom of a window sash so that the resilient side comes in contact with the sill as used by plaintiff and which is also used in the defendants' accused structure. The weather strip in the Lane patent is different in contour but the basic operative elements, that is, being held in the groove provided at the bottom of the sash by legs and resiliency of the strip, bear close resemblance to defendants' structure. See the Kleinman patent, No. 1,808,043, fig. 6–11. Here the weather strip is firmly caught by the legs on each side of the sash and a three point contact is made with the sill. The Doering patent, No. 1,812,822, shows a weather strip with the end (or "leg") firmly held in place in a vertical slot (as distinguished from a horizontal slot in the case of plaintiff's patent Claim 17). The strip is resilient and a long "leg" of the strip is held in place by a leg at the bottom of the window. All five weather strips, plaintiff's, defendants', and the three in the prior art, effect and function as weather strips when the window is down and the resilient strip contacts the window sill.

▮ Because of the prior art in the respects set forth, a skilled mechanic should have no difficulty in developing either plaintiff's strip or defendants' strip when shown the prior art. We find no invention or discovery in plaintiff's combination of the elements of the lower rail of the lower sash for the particular form arrangement of the weather strip and we

therefore hold Claim 17 invalid for lack of invention.

## Claim 21 (and Claim 22)

We do not deem it necessary to discuss these two claims at length. Claim 21 refers to the same general combination of elements as covered under Claim 11 as being slightly more specific in that the weather strip "urges" the sash in contact with the parting strip, and the "end face" or a projecting rib of the sash is "disposed in" a channel or slot in the jamb channel between the parting strip and weather strip.

Claim 21 reads as follows: "In a window of the double hung type a frame comprising a channeled jamb member having channel walls comprising a parting strip, an inner stop bead and an outer stop bead, resilient metal weather-strips carried by said inner and outer stop beads, and upper and lower sliding sashes, the upper sliding sash having its end face disposed in the channel between the parting strip and the resilient weather-strip carried by said outer stop bead and being urged by said resilient weather-strip into contact with said parting strip, and the lower sash having its end face disposed in the channel between said parting strip and the resilient weather-strip carried by said inner stop bead and being urged by said weather-strip into contact with said parting strip, sealing contact being normally obtained between the sashes and said parting strip and between the sashes and the respective weather-strips at all times."

That portion of Claim 21 reading as follows has no application to defendants' structure, to wit: "the upper sliding sash having its end face disposed in the channel between the parting strip and the resilient weather-strip carried by said outer stop bead and being urged by said resilient weather-strip into contact with said parting strip".

The accused structure of the defendants shows no tendency to force or urge the sash toward the inside of the window or toward the parting strip. Wholly different in operation from the plaintiff's structure, defendants' sash slides between the two rounded edges or corners of its weather strip, with an equal space between the sash and jamb channel.

■ We think the effect of plaintiff's weather strip being resilient and thereby urging the sash in contact with the parting strip evidences no invention or discovery. It is a mechanical result of the location of the weather strip on one side of the sash.

But this is the feature of the patent this claim is directed to. See file wrapper (Def. Ex. AG): "Claims 49 and 50 (issued as claims 21 and 22) also include a side weatherstrip construction, but these two claims relate to the construction whereby the resilient weather strip urges the sash into contact wtih the parting strip."

The sash does not contact the parting strip in defendants' structure. The accused structure does not infringe Claim 21 in the material and substantial respect set forth in the claim.

## Claim 22

■ Claim 22 covers substantially Claims 11 and 21 and goes specifically to the "flange projecting from" the "face" of the sash into sealing contact with the weather strip. Claim 22 reads: "In a window of the double-hung type, a frame, including a channeled jamb member, having a parting strip thereon and a stop bead at opposite sides of the channel, said stop bead having a pocket therein opening toward said parting strip, a U-shaped resilient metal weatherstrip mounted in said pocket, and a sliding sash mounted to slide in the channel with its end face disposed in the channel between said parting strip and said weather-strip and to be normally held in contact with said parting strip by the resiliency of said weather-strip, said sash having a flange projecting from its face into sealing contact with said resilient weather-strip."

The flange projection, covered by Claim 22, on the face of the sash for contact with the resilient weather strip is absent from the defendants' structure. The projection for contact with the sash is on each end of the weather strip of the accused structure. In defendants' structure a leg on the outside of each side of the sash frame

extends into the channel of the jamb where contact with the weather strip is made.

Plaintiff has failed to prove infringement of its Claim 22.

## Claim 29

Claim 29 reads as follows: "In a window of the double hung type, in combination, a sash, means forming a channel for receiving the sash, comprising a stop bead, a longitudinally flexible metal sealing member having a substantially flat face for engaging the sash, said sealing member being housed in the stop bead and having its sash engaging face terminating in a freely flexible edge and means adjacent to the base of said stop bead forming a shoulder to cover and guard said edge."

Claim 29 is generally a combination of Claims 11, 21 and 22 and what we have said in disposing of Claims 11, 21 and 22 we by reference use in disposing of Claim 29.

The accused structure does not infringe Claim 29. It does not have a "longitudinally flexible metal sealing member having a substantially flat face for engaging the sash". Nor is the following portion of Claim 29 applicable to the accused structure—"said sealing member being housed in the stop bead and having its sash engaging face terminating in a freely flexible edge". Nor does defendants' structure have "means adjacent to the base of said stop bead forming a shoulder to cover and guard said edge".

Defendants' sash operates in a channel shaped weather strip mounted in the jamb. The ends of the weather strip have a rounded bead bearing on each side of the sash and the free edge of the strip is hemmed and lies under the flanged jamb leg or "stop bead". A wholly different principle from plaintiff's strip and method of contact on sash. Plaintiff's weather strip bears no resemblance to defendants' in form, means of mounting, or manner of functioning. Plaintiff's strip is housed in the "stop bead". Defendants' occupies or is housed in virtually the whole of the jamb channel. The mounting of the strip in the "stop bead" was "featured"—"particularly" to the Patent Office by plaintiff

under this claim. A feature not even suggested in the accused structure.

Lane patent, No. 1,815,718, shows a structure in harmony with defendants' accused structure with the principle of the sash operating within the weather strip rather than coming in contact with the jamb member as such. Sweet's catalog, 1930, shows the Michaels Art Bronze, A–871; and the same catalog, A–870, shows the sealing member having a substantially flat face for engaging the sash member with means provided adjacent to the base of the stop bead to cover and guard the edge of the sealing member. We conclude Claim 29 is illegal for lack of invention.

## Claim 30

Claim 30 is a combination intending to broaden Claim 29, reciting that the sealing member is housed in either the sash or the frame members. It reads as follows: "In a window of the double hung type, in combination, relatively movable sash and frame members, a sealing member housed in one of said members for engaging the other, said sealing member having a substantially flat face which terminates in a freely flexible edge, and said member in which the sealing member is housed being formed with a shoulder to cover and guard said edge."

For reasons heretofore stated in disposing of Claims 11, 17, 21, 22, and particularly 29, we hold the accused structure does not infringe Claim 30 and that Claim 30 is illegal for lack of invention.

## Claims 32 and 33

We will, as the parties have, consider these two claims together. They read as follows:

"32. In a double hung window, in combination, a frame, upper and lower sashes slidably mounted in the frame and each having a meeting rail, a sealing extension on the meeting rail of the upper sash having an upwardly extending lip or flange spaced inward from the rail, a sealing extension on the meeting rail of the lower sash having a downwardly extending lip or flange spaced

outward from the rail, the lip of the lower sash being disposed to engage the outer face of the lip of the upper sash when the window is closed, and a sealing member housed in the extension of the upper sash rail and disposed to engage the flange of the extension of the lower sash rail when the window is closed and to have its edge covered and guarded by the flange of the extension of the upper sash rail when the window is open.

"33. In a double hung window, in combination, a frame, upper and lower sashes slidably mounted in the frame and each having a meeting rail, a sealing extension on the meeting rail of the upper sash having an upwardly extending lip or flange spaced inward from the rail, and a sealing extension on the meeting rail of the lower sash having a downwardly extending lip or flange spaced outward from the rail, the lip of the lower sash being disposed to engage the outer face of the lip of the upper sash when the window is closed, and a resilient sealing member mounted in the sealing extension of the upper sash meeting rail and having a tongue portion normally in engagement with the outer face of the lip of said sealing extension but adapted to be wedged away therefrom by the lower sash lip when the window is closed."

These two claims are directed to the meeting rail combination of lower and upper sash. Plaintiff's claims describe a meeting rail of the upper sash with an inwardly projecting extension, with an upwardly extending lip, and the meeting rail of the lower sash with an outwardly projecting extension having a downwardly extending lip or flange. The extensions engage when the upper and lower sash are closed. A weather strip is housed in the extension flange of the upper sash and engages the flange on the lower rail when the window is closed. The free edge of the weather strip moves outwardly to engage the outer face of the lip of the flange on the upper sash when either window is open and is pushed in by contact with flange or lower rail when windows are closed. Plaintiff argues—(page 105 of brief) "defendants have used this same combination of elements in their A–100 window". We

find no evidence to support any such conclusion. Other than outwardly projecting extensions on the meeting rails of the lower and upper sash and a downwardly and upwardly extending lip thereon the two structures are substantially different in operating principle and in form. A material and substantial feature of plaintiff's structure under these two claims is the wedging effect obtained between the extensions on the upper and lower sash: "the lip of the lower sash being disposed to engage the outer face of the lip of the upper sash when the window is closed."

Any such result on defendants' structure is problematical and not intended by the construction. Mr. Weimann testified on the subject:

"Q. Now you do have a contact, going over to this Exhibit 6, you do have a contact at the point between the surfaces that are indicated by H? A. Well, a contact could be created there but even there it is not meant to have a contact, but due to the lock and the commercial tolerances, there is a possibility of contact."

Plaintiff finally resorted to the window locks, no part of plaintiff's claims, as producing contact:

"Q. Doesn't the lock tend to pull those rails together, so that single surfaces make contact? A. Yes, it makes contact with the weatherstrip."

Contact with the weather strip is not the same thing as described in plaintiff's claims, it is contact with the "lip" of upper and lower sash; and not when window is locked, but when window is "closed".

Take this language from Claim 33: "the lip of the lower sash being disposed to engage the outer face of the lip of the upper sash when the window is closed".

There is no wedging action in defendants' structure. The point or edge of the downward extension on the lower sash simply drops vertically down and comes in contact with the resistant face of the weather strip lying in a channel formed in the extending flange of the upper sash. The strip is entrapped in the channel by an extending leg. It is not fixed in the channel but floats. Plaintiff's strip is fixed

to the upper bracket. Should it become loose from its attached position it would cease to function. No such hazard exists in defendants' structure. Plaintiff originally had a claim (21) that would seem to be the base for its present argument: "21. In a window construction, upper and lower sashes each having a meeting rail, a resilient weather strip carried by the inner face of one of said meeting rails, a web on the other meeting rail adapted when the sashes are closed to engage said weather strip, and a weather strip carried by the lower bar of the lower sash adapted to engage a fixed part of the sash frame when the sash is closed."

But this claim was cancelled prior to issue of the patent and cannot now serve for comparative purposes. We find no proof of infringement.

The gist of these claims is meeting rails of the sash of a double hung window, the bottom of the upper sash having an inward flange and top of the lower sash an outward flange, so that when the two sashes are in closed position the projection on the bottom of the upper rail provides a hook that will meet like construction on the top of the top rail of the lower sash and which will by a wedge operation contact each other. This is not discovery revealing a flash of creative genius as of 1937 when patent 2,084,355 was issued. Such a construction of sash rails to get a wedging result when the windows are closed is old, as the art of the double hung frame window. Plaintiff's claims 32 and 33 cover a structure that shows some change in the form and position of the extrusions to get wedging effect but the principle remains the same as in the prior art. As we read claims 32 and 33 and apply them to drawing showing the patent, the structure impresses us as one any good mechanic could produce when shown the prior art and told the results desired.

The Lane patent 1,663,134 (1928) shows in the place, stressed as evidencing an infringement by plaintiff, an almost identical meeting of the sash members on the wedge principle. Also the weather strip engages the same extended part as in plaintiff's device, and the weather strip, while of different shape, is housed in the channel of the upper sash, the free leg forming a wedge contact very similar to plaintiff's structure. Note also the weather strip leg contacting the extension is verticle in the Lane patent, as in plaintiff's. See Brogden patent 1,768,740. Similarity in plaintiff's formation of wedge members is evident in Polachek patent 1,545,453 except the slanting side of the projection does not produce the closing result as in plaintiff's patent. A similar feature appears in patent under the same name, No. 1,808,607. Here we see the weather strip in a reversed position from the plan of plaintiff. In the Polachek patent the weather strip contacts the inside edge of the overhang at the top rail of the lower sash but the weather strip is held firmly in place in a vertical position, by a screw in the Polachek patent and by a firm insertion in a groove of projecting edge in plaintiff's patent.

While plaintiff's structure members produce the sealing result in one place by virtue of wedging with the overhang hook of the lower sash with the face of the strip, as in the Lane and Polachek patents, defendants' weather strip effects the seal by virtue of the end of the hook overhang of the lower sash coming in contact with the weather strip at the lower edge or end of the hook overhang. Defendants' weather strip lies in a groove, held there by the protruding edges of the groove. Its position is that it lies horizontal in the groove. The strip in plaintiff's structure is sealed in a groove in a vertical position. Installation of defendants' weather strip is manifestly much more simple than that of plaintiff's. Plaintiff's strip is in full view when the lower sash is slightly raised. Defendants' strip cannot be seen, except in part by looking down on the top of the lower sash, when the upper and lower sash are closed. We conclude plaintiff's claims 32 and 33 are void for lack of invention.

## Patent 2,084,776

### Claim 12

Claim 12 reads: "In a window, in combination, a frame, a sash guided for sliding movement therein, said frame comprising a sill member having an open-sided housing

formed therein, and a sealing member housed in the sill member and exposed to contact with the lower inner edge of the sash through the open side of the housing, said sealing member being composed of a resilient sheet metal strip folded into polygonal form and having its longitudinal edges free, and of single ply form, and said housing having a shoulder for covering and guarding the edge of the sash engaging web of the sealing member."

■ This claim covers the combination in a window with sliding sash and frame, the sill member of frame having an open-sided housing on the side adjacent to the bottom of the lower sash. In this housing is inserted a sealing member or weather strip that contacts with the lower inner edge of the sash, at the open side of the housing when the sash is down. The sealing member is composed of a resilient sheet of metal folded in triangular form having three sides as distinguished from a U or flat form. When the sash is up the lower edge of the weather strip which contacted the window when it was down moves out to contact a shoulder of the sill, thus sealing the housing. Plaintiff represents that the only difference between plaintiff's structure and defendants' is that plaintiff arranges the edge of the weather strip on the inside of the shoulder whereas defendants arrange it on the outside of the shoulder. "These arrangements are the equivalent". We are at loss to apply this description to the two structures.

An examination of the accused structure shows this difference, as compared with plaintiff's structure. Defendants' weather strip is different in shape from plaintiff's. Defendants' strip has hemmed edges; plaintiff's does not. One edge of the strip is free of the housing in defendants' window; neither edge of the strip is free in plaintiff's window. The defendants' strip engages the face of the sash, while plaintiff's engages the lower edge of the sash.

The file wrapper (Def. Ex. AH, p. 35) shows that long after making application for this patent, plaintiff added to the description: "and of single ply form, and said housing having a shoulder for cover-

ing and guarding the edge of the sash engaging web of the sealing member."

These elements are missing in the accused structure. It hardly becomes plaintiff to say they are not material.

Prior art which we will presently refer to was an obstacle to plaintiff before the Patent Office. We refer to it now as showing the materiality of differences in plaintiff's and defendants' structure. One argument used to meet the prior art was (Def. Ex. AH, p. 38): "The remarks concerning Campbell apply also to Flagg and Barr. The rejection of claims 12 and 13 upon Lane, 1,815,718, should be withdrawn. The sill carried sealing member in Lane has rolled edges and is not, therefore, longitudinally flexible. Neither is the sill provided with a shoulder to cover and guard a raw edge of the sealing member."

Defendants' structure as we have said has hemmed edges and like "Lane * * * is not therefore longitudinally flexible". The structure of defendants does not have a sill with a shoulder "to cover and guard a raw edge of the sealing member".

We find no infringement of Claim 12.

We examine the prior art. An examination of the Lane patent, No. 1,815,718 (1928) (Fig. 2), shows a sealing member housed in the sill (72, 74). It closely resembles plaintiff's structure; one difference between the Lane patent and plaintiff's structure is the sealing member of the Lane patent has rolled edges and is not sealed by a shoulder of the housing, as is also the case with defendants' structure. There is a further distinction to be noted in that the sash contacting the sealing member of plaintiff's structure slightly enters the housing. Such is not the case with the Lane Patent or defendants' structure. This was one of the prior art patents that gave plaintiff trouble when it sought its patent 2,084,776.

See also Michaels Patent 1,650,640 (November 1927). Plaintiff's use of sill to house the weather strip held in place by legs is suggested by Sweet's 1930-A-871. The Stein patent, 1,688,836 (1928), and Dreher patent, 1,791,808 (1931), suggest the housing of the strip in the sill.

We are of the opinion that plaintiff's structure is in essence found in the prior art. Pocketing of the strip in the sill is an old art. Plaintiff has changed the curves, the angles, but the principle is the same. We conclude claim 12 is void because not an invention in view of the prior art.

## Claim 16

There is a dispute between the parties as to how patent 2,084,776 should be interpreted. It is plaintiff's position that Claim 16 covers a combination of a pre-fabricated window construction which includes the combination of an outer rigid wooden frame with inner complete metallic frame and with slidable sashes mounted for operation in the metal frame. Defendants urge misrepresentation of what is shown and claimed in the patent, that *the only wooden frame disclosed by the patent is the framing of the window opening in the building structure itself.* "There is no suggestion in the patent of a wood sub-frame of any kind". If for the purpose of deceiving the public the description and specifications filed by the patentee were made to contain less than the whole truth, that is a defense to plaintiff's charge of infringement.

Claim 16 reads as follows: "In a window, the combination with a rigid outer supporting wood frame forming a complete accurately formed rectangular window enclosure and comprising a sub-sill, jambs and a header of a complete metallic frame built into the wood frame, and a sash slidably mounted in the metallic frame, said metallic frame being composed of sill, jamb and head members all of which are rigid extruded pieces formed of non-corrosive metal."

Plaintiff's brief quotes from the objects stated in the specification, "page 1, column 1, lines 1-18". This reference does not aid in settling this issue. The following then appears in plaintiff's brief:

"On page 1, column 2, lines 48-49, it is pointed out that:

"'The window of Fig. 1 is shown as mounted in a wall 1.' This wall is, as pointed out by Mr. Jorss (R. 566), the cross-hatched triangle at the upper left of Fig. 1. It then continues to describe that the *window* will include wooden jamb, header and sub-sill as well as the moulding strips 2." (Emphasis ours.)

As we read the language of the patent referred to it is as follows: "The *building structure* may include the usual wooden jamb, header and subsill, and wooden retaining or moulding strips 3". (Emphasis ours.)

At the top of page 33 of plaintiff's brief confusion is again introduced as to the language appearing "at the bottom of the second column of page 1". In neither of the references in the brief is the term "building structure" included, as accuracy calls for.

While plaintiff is here stressing the wooden frame features of its claim 16, we cannot escape the conclusion, the patent is vague on the subject. Figures 1, 2, 4 and 5 of plaintiff's patent drawing show a wood frame. We look in vain for evidence it is not a part of the building, but a pre-fabricated sub-frame. A reading of the patent leaves the impression the metallic window frame parts are built into a wooden frame, which is a part of the structure of the building. Emphasis is given to this conclusion when we examine Figure 4 of the patent and find the header and sill without numbers. If they constitute a part of the essential and substantial elements of the patent of the combination of the pre-fabricated metal window with a wooden frame, it is strange to find them not cataloged and keyed to the patent description according to time-honored practice. As originally filed the patent assigned numbers to the wooden sub-sill, frame, and header (2, 2A and 2B). Later these numbers were omitted.

We find it hard to reconcile Claim 16 to plaintiff's present interpretation with this withdrawal on such a vital claim in the patent. If plaintiff's present position is correct we can only conclude that the patent was thus made to contain less than the whole truth relative to the invention. What is now Claim 16 was originally 19. During prosecution of the patent it was amended. The changes appear. Those

added during prosecution are shown in parentheses and those parts omitted are shown underscored: "(16) 19. In a window, the combination with a (rigid outer supporting) wood (frame forming a complete accurately formed rectangular window enclosure and comprising a) subsill, *frame* (jambs) and (a) header, of a (complete) metallic frame built into the wood frame), and a sash slidably mounted (in the metallic frame) *therein,* said (metallic frame being composed of sill, jamb and head members all of which are rigid extruded pieces formed of non-corrosive metal."

Certainly this does not support plaintiff's present claim of prefabrication of the outer wood frame.

Plaintiff sets out a part of its argument in brief (p. 38) made to the Patent Office to secure allowance of claim as amended to sustain its present claim of a prefabricated unit in a sub-frame. For some reason that does not appear we are not able to find that the substance of the argument was placed in the patent specifications.

Mr. Jorss, an expert on this subject, testified as follows to what is found in the patent:

"Q. What does the patent say of this wood frame that you have found shown in the drawing? I refer you to page 1, column 2, at the bottom of the column, last paragraph. A. 'Window, figure 1, is shown as mounted in a wall. The building structure may include the usual wooden jamb, header, and sub-sill, and wooden retaining or moulding strips along the top or sides of the window opening. The window frame comprises a metallic sill member 4, metallic uprights or jambs 5, and a metallic head. The frame is adapted to be used with either wooden or metal sashes, but it is preferably used with a metal window having an upper sash 7 and a lower sash 8 of the construction illustrated.'

"Q. That is quite enough, Mr. Jorss. Now, is there any description of the wooden frame in that patent other than in the passage which you have just read as being part of building structure? A. No, sir

"Q. And as you examine the structure shown in figure 1, is that a complete metallic frame, or how is that frame constructed? A. I would say that this frame is constructed of pieces, that is, a separate head and separate sill, and two separate jambs.

"Q. If those pieces were assembled into a complete frame before it was installed in the wooden frame, could you make the installation as shown in that figure 1? A. Very definitely not."

We are of the opinion that plaintiff's Claim 16 is vague and fails plainly and explicitly to describe the claim as now alleged, and as required by statute. When we give to it the interpretation given by plaintiff at time of amending Claim 16, it frees defendants of any claim of infringement. That interpretation plaintiff gives as follows:

"The claim *now* brings out that the outer frame is rigid and is a supporting frame which forms a complete, accurately formed rectangular window enclosure, and that the metallic frame composed of rigid, extruded pieces of non-corrosive metal *is built into the wood frame and carried by it.*

"With this kind of construction the outer wooden frame is made absolutely true and rigid *at the factory* so that its opposite sides are held permanently in parallelism. The non-corrosive metallic frame is *then* built into the wooden frame, the parallelism of the jambs of the non-corrosive frame *being definitely assured by the parallelism of the wooden frame."* (Emphasis added.)

To construe Claim 16 as plaintiff thus argued to the Patent Office, after construction of the wooden frame the metallic frame is "then" built into the wooden frame. It is even represented in the argument that the parallelism of the wooden frame assures "parallelism of the jambs of the non-corrosive frame".

Defendants do not build an inner frame into an outer wooden frame. Plaintiff does not claim they do, but plaintiff now says it was only giving "a definition of a conclusion that existed in the finished article of manufacture", in its argument to the Patent Office set out above. (Brief page 40) That conclusion in this case we

do not accept. When plaintiff's argument was made to secure allowance of Claim 16, plaintiff was reasonably to be understood as describing a step of a method of assembly of the window—a process not used by defendants. Defendants' A–100 windows are assembled after the jamb and head members are secured to separate parts of a wood frame and these wooden parts with metal parts attached are then assembled by joining the wooden corners to complete a combined wooden-metal frame. The A–200 windows—the metal frame is first assembled and the wooden frame is built around it.

Plaintiff's patent fails to meet the test laid down by the Supreme Court where the circumstances are such as presented in this case. Wooden frames around steel windows are old and now show nothing more than the exercise of mechanical skill over the prior art.[3] Invention is absent.

The following is from Sweet's Catalog, 1932, B–1567, Stanwin Casements:

"Wood Surrounds of Clear Heart Redwood Kiln Dried are Furnished by Us to Fit All Standard Size Stanwin Casements, and are Supplied with Screws, Ready for Attaching to Sash at Time of Erection.

Surrounds Have Mitred Overlapping Joints. Absolutely no Cutting or Fitting is Required on the Job.

They are Designed with a Groove into which Flange of Section Fits, and when Sash are Pointed with Mastic this Feature Assures Absolute Weathertightness."

Plaintiff has "not yet found it expedient to use the combination" it now asserts by Claim 16. A question of its usefulness, as set forth in the claim, is raised. I am not a mechanic, but to construct a wooden frame and then inside of it construct a metal window does not impress me as practical. But we make no finding on this subject.

### Claims 17, 18 and 20

Claims 17, 18 and 20 read as follows:

"17. In a window, the combination with a rigid outer supporting frame formed of rigid bar members angular in cross section comprising a sub-sill, jambs and a header, said members being rigidly and accurately united to form a complete rectangular window enclosure, of a complete inner frame composed of non-corrosive metallic rigid extruded pieces built into the outer frame and carried and held in alignment by the outer frame."

"18. In a window, the combination with a rigid outer supporting frame formed of rigid bar members angular in cross section comprising a sub-sill, jambs and a header, said members being rigidly and accurately united to form a complete rectangular window enclosure, of a complete inner frame composed of formed non-corrosive metallic sheets or plates built into the outer frame and carried and held in alignment by the outer frame."

"20. In a double hung window, the combination with a rigid outer supporting frame formed of rigid bar members angular in cross section comprising a sub-sill, jambs and a header, said members being rigid and accurately united to form a complete rectangular window enclosure, of a complete inner frame composed of formed non-corrosive metallic sheets or plates built into the outer frame and carried and held in alignment by the outer frame, and sash counter-balancing means mounted upon and carried by the outer frame."

These claims show only slight differences. Claim 20 does bear upon a sash balancing screw into outer frame.

What we said under prior division on Claim 16 with regard to claim being vague and describing a method of assembly, applies to Claims 17, 18 and 20, when viewed as plaintiff would have them interpreted.

But here we have an issue on another feature of the claims. It is plaintiff's position that the language—"a rigid outer supporting frame formed of rigid bar members angular in cross section compris-

3. Sweet's 1927–28, Detroit Steel Products Co. A962; Sweet's 1930, Detroit Steel Products Co. A1218; Sweet's 1932, Crittall Casement Window Co. B1567; Sweet's 1921, Crittall Casement Window Co. 771; Sweet's 1930, Detroit Steel Products Co. A1219; Sweet's 1931, Michael & Pfeffer Iron Works A1185.

ing a sub-sill, jambs and a header, said members being rigidly and accurately united to form a complete rectangular window enclosure" appearing in Claims 17, 18 and 20, should be read upon and as covering the wooden outer frame used by defendants. Defendants urge the language should be construed to mean "metal channel or angle bars".

At the outset we are impressed that in Claim 16 plaintiff plainly labeled the outer frame "wood". Did it so intend Claims 17, 18 and 20? We look to the conduct of plaintiff when the patent was pending for the answer. Claims 17, 18 and 20 were placed in the patent application subsequent to its filing. The specifications contain this language: "The form of embodiment disclosed in Figures 6 and 7 is to all intents and purposes identical with that of Figures 4 and 5 with the exception that the non-ferrous members of the window frame are reinforced and made more rigid *by steel members.*" (Emphasis added.)

No reference is made to a wood frame in the specifications. It is not suggested that the steel members are substituted for wood members. Figure 6 shows the outer steel frame by numbers 96, 97, 98. The specification identifies them: "Each of the members 96, 97 and 98 is in the form of a channeled angle bar which is rigid and strong for its weight."

In urging allowance of Claims 17 and 18 plaintiff represented to the Patent Office: "New claims 24 and 25 (issued as 17 and 18) are directed to the form of the invention in which a complete rigid outer frame composed of angular bars is provided. * * * Applicant's construction, by employing a steel sub-frame gains an extremely rigid construction while saving about half the weight of the facing metal of the Rappaport window." (Def. Ex. AH, p. 53.)

We conclude plaintiff's present position on Claims 17, 18 and 20, that they cover a wooden outer frame is without any foundation in the ·patent. The outer frame described is a "channel angle bar * * * rigid and strong for its weight * * * a steel sub-frame". There is no claim that

defendants use a steel or metal sub-frame. We find no infringement.

It is further our conclusion that the supporting of a window casement or double hung in either a metal frame or a wooden frame by screws to the metal or wooden frame, as the case may be, does not denote invention in the building trade. See prior art under Claim 16; also see Sweet's Catalog, 1910, page 311.

The attaching of the window counterbalancer to the outer frame, either prefabricated or a part of the building, by a screw (Claim 20) does not represent invention in the building trade. It is a natural mechanical act evidencing no spark of inventive genius. Where else would one attach such a balancer?

### Patent 2,257,123
### Claim 12

■ Claim 12 of this patent covers that part of the upper sash top rail housing the weather strip. The top rail has two legs or flanges of equal length extending upward from the sash. A V-shaped weather strip is interposed horizontally between the two legs and entrapped by projections inward on the two flanges. The free end of the weather strip is depressed when the sash is raised because the weather strip engages with a rib on the header of the frame. When the sash is lowered the weather strip · rises and engages the projection of the leg and is thus prevented from moving out of the channel between the two legs. Also it effectively closes the channel preventing any foreign matter from getting into the inside of the weather strip. The result is that the weather strip automatically adjusts itself to the sash and header as the sash is raised and lowered.·

Claim 12 reads as follows: "A window construction including a sash having upper, lower and side sash stiles, said upper sash stile having an inner upwardly extending flange terminating in an outwardly extending lip and an outer upwardly extending flange of substantially the same height as the inner upwardly extending flange having an inwardly extending lug situated

thereon below the upper extremity of said flange and a resilient V shaped metallic weather strip entrapped therein, one leg of the V lying between said flanges and the other leg of the V held from unlimited movement by said lip."

One of plaintiff's claims for its structure as described in its specification of its patent contains this language: "The ends of the flanges 75 and 77 are adapted to contact with the member 21 [which refers to the top of the window frame or header] at each side of the bead 73 so that a three point seal is provided."

Plaintiff and defendants join issue on whether defendants' accused structure has the two upward extending flanges, of equal length, so when the window is closed the two flanges and weather strip engage the header and result in a "three point seal". Plaintiff argues the testimony shows the flanges on defendants' sash are "substantially" the same height.

The accused structure shows an upper sash top rail having two legs or flanges extending up from the top of the top rail of the upper sash and by virtue of the flanges having a short horizontal projection inward a channel is formed that entraps the weather strip. The weather strip has a hump on its upper portion designed to engage the header or the bottom of the window frame. The two projecting legs of defendants' structure are of unequal length, one leg being 5/32 of an inch longer than the other.

"Q. And how far away is the short flange from the lower surface of the header when the window is in closed position? A. About 5/32 of an inch.

"Q. I think you said yesterday that they both substantially meet the header? A. I think I feel guilty. I think Mr. Morris asked me the question. I don't know. I don't remember whether it was the 100 or the 200 but the relation between this 100 and 200 is practically the same and he asked me that question and I said that both of these flanges engaged the header and it is not possible for those two to engage." (Weimann testimony.)

The difference in length while small yet represents a substantial and material variation in a window sash. Defendants cannot represent a three point contact with the header when the sash is up, as plaintiff does. Defendants can only represent a two point contact, namely the weather strip and the one flange. We cannot agree that while one of the flanges on the accused structure is 5/32 of an inch shorter than the other, they are "substantially the same height from a practical point of view", as urged by plaintiff. We are discussing distance between part of a sash and header when a window is closed. Plaintiff saw fit to set forth, in describing its structure in the specifications of its patent, that a "three point seal is provided". They then considered the point material. We believe a salesman would make some impression in selling the structures by stressing this point—"our window gives contact with the header with both flanges; look at the crack between the sash and header on our competitor's window".

There could be no contact between the weather strip on plaintiff's structure and the header but for the rounded bead on the bottom of the header. This is not a part of the claim. However it is apparent no such element is found in defendants' structure.

We find no infringement of plaintiff's claim by defendants' structure.

A more conclusive answer to the charge is found in the prior art which renders plaintiff's structure invalid. The Renton patent, 1,599,286, 1926, shows a structure with two legs extending upward from the top of the sash rail, that they are of equal length, that there is a weather strip between the two legs that engages a projection extending downward from the header. Plaintiff's weather strip engages a projection extending downward from the header. The Renton patent shows a "three point seal", when the window is closed, as claimed by plaintiff in its specifications. The same is true of the Montgomery patent, 2,189,960, 1940, flanges of equal length and a three point seal. In neither the Renton

nor Montgomery patents is the free edge of the weather strip sealed or entrapped. However Michaels patent, 1,650,640, 1927, shows an entrapped weather strip contacting a projection. Kleinman patent number 1,808,043 (Fig. 8) shows an entrapped weather strip (102) and when the window is closed a three point seal (98, 92, 94). In the Kleinman patent the drawing apparently refers to the lower sash contact with the sill (see Fig. 6) but contact with the two legs extending downward from the sash is evident and the third contact between the sill and the weather strip can be seen. Absent the entrapped free edge of the weather strip, defendants' structure follows more closely Lane patent 1,663,134, 1928, with its unequal leg feature, than it does that of plaintiff's structure. So if defendants' structure could be held to infringe plaintiff's patent it would follow that plaintiff's patent is anticipated by the Lane patent.

We conclude that any skilled mechanic acquainted with knowledge of the prior art would have no difficulty in producing either plaintiff's or defendants' structure. They represent mechanical skill only in alterations and not in inventions in our opinion.

### Patent 2,304,063
### Claims 1 and 5

The two claims at issue under this head are substantially the same. Claim 1: "In window construction, the combination of a window frame and a sliding sash mounted therein, said frame including jambs having sash guiding ribs projecting therefrom, said sash having channeled stiles and resilient sheet metal sealing and guiding members mounted in said stiles, said guiding members each comprising a base and a pair of resilient tongues carried by said base, said resilient tongues engaging opposite sides of said guide ribs, the sidewalls of the channeled stiles having pairs of spaced inwardly extending projections thereon engaging portions of said resilient sealing and guiding members for retaining them in position in the stiles."

Claim 5: "In window construction, a frame including sash guiding ribs, a window sash including hollow metallic stile members, said members having flanges extending from each edge of the base thereof, said flanges having pairs of oppositely disposed inwardly extending rib portions on the inner sides thereof, and resilient metallic weather strip member entrapped between said pairs of ribs, said weather strip members having resilient tongues engaging the guide ribs on the frame."

Plaintiff would have the Court construe these claims as specifying three sash guiding ribs or flanges, one being what is usually referred to as the parting strip (79), a second being the inner jamb of the frame (80) and the third the projection from the jamb (86) which engages the weather strip and referred to in the claims as the "sash guiding ribs". By this process plaintiff would have the accused structure infringe its patent because in the accused structure one side of the weather stripping "is turned outwardly and back to lie between the flange of the sash and inner side of the jamb"; the other side is turned similarly out and back to lie between the sash and inner side of the parting strip. Result being to cause defendants' weather strip to lie between the flange of the sash and the "guide" of the jamb, and "guide" of the parting strip, "thus obtaining the same result", plaintiff asserts, as represented in plaintiff's patent. Plaintiff's position is without support in the record. The specifications for plaintiff's patent (page 2, column 1, lines 53–56) read: "Intermediate each of the flanges 80 and 81 [which are the inner and outer edges of the frame] and the parting strip [which is in the middle of the frame] are situated the guide ribs 85 and 86 respectively for engagement with the sash rail in the manner to be described."

The figures 86–85 in the drawing plainly refer to the projection from the frame that engages the weather strip projecting from the sash in approximately the middle of the sash. Again in the specifications (page 2, column 2, lines 2–5): "The legs 99 and 100 [which are extensions on two sides of the triangular formed weather strip] of the triangles extend toward the jamb 12 and engage on either side of the guide ribs 85 and 86 in sealing sliding relationship.

We do not agree with plaintiff that claims one and five can be broadened to "encompass the out-turning of the weatherstrip as employed by defendants". This is a substantial departure from the claims and not a mere colorable one. Results are obtained by entirely different means. The very case cited by plaintiff to sustain its position is to the contrary. "Even where the invention must be restricted in view of the prior art to the form shown and described by the patentee and cannot be extended to embrace a new form which is a substantial departure therefrom, there is infringement where the departure is merely colorable." E. H. Bardes Range & Foundry Co. v. American Engineering Co., 6 Cir., 1940, 109 F.2d 696, 698.

The patent specifications show with particularity that the ends of the weather strip engage "on each side" of the "guide" ribs "86 and 85". By no process of interpretative gymnastics can "86 and 85" be read on to parting strip or the inner side of the jamb member.

We find no infringement in the accused structure. Plaintiff by its argument, in attempting to free itself from the terms of its patent, admits the accused structure has no guide ribs in any way resembling those shown in drawing of its patent (85 and 86).

We called for a section of the sash and jamb member of this patent. On paper it did not look practical. We wanted to see how it worked. What we received in no way resembled the drawing. We have grave doubts that plaintiff has found it useful.

Plaintiff has failed to carry the burden of establishing infringement of its patent in the accused structure of defendants. Engaging a weather strip in the sash member is not a new discovery by plaintiff. It is only by restricting plaintiff's structure to the specifications of the patent that it can be protected from the force of the prior art. Give the specifications the broad interpretation urged by plaintiff and the patent becomes illegal because of prior art. The engagement of a weather strip substantially triangular in shape, entrapped in the sash and meeting with the guiding rib in jamb is found in the Hamilton patent 1,732,470 and Renton patent 1,599,286. Engagement of a projecting guide rib by a weather strip in the sash is found in Lofy patent 1,750,897. See also Axe patent 1,922,009 and Forsyth patent 1,063,346.

### Unfair Competition

As we conclude our ruling on the patents in issue we are strongly impressed that plaintiff in general has sought—of necessity—a liberal interpretation of its various claims and patents and thereby extension and expansion of its claims in order to bring them to bear on the accused structures. In some instances, as it will be observed, this course has led plaintiff impliedly to request that we treat as absent material elements of the claims, which are in plaintiff's patent. In other instances if there is a bearing of a part of a claim the fact that other material elements of the claim are missing in the accused structure are ignored. When it comes to the prior art the opposite position is taken. We are asked to construe the prior art strictly and give it no consideration as bearing on plaintiff's patent if not present in every element. This position plaintiff argues it is entitled to because of the circumstances of this case—the hiring of the three individual defendants while they were still in plaintiff's employ, or the unfair competition phase of the complaint.

It is our conclusion the record does not sustain plaintiff's charges of unfair competition. The claim cannot be sustained by inferences that fail to find a basis fairly deducible from the record. Plaintiff has the burden.

The circumstances of the personal defendants going with the corporate defendants is undisputed in any respect by plaintiff. They had become dissatisfied with their connection with plaintiff and were considering plans to go in business for themselves. One of them learned thereafter, through the Aluminum Company of America, that defendants were studying the subject of manufacture of aluminum windows. Defendant Moran first contacted the corporate defendants. One or two

946

conferences were held and the personal defendants were hired in April 1946. Full minutes of these conferences, at least the New York conference, were made. There was no attempt to hide or cover up the details of the negotiations by any defendant.

The personal defendants violated no contract or law in leaving plaintiff's employ and going with defendants. If they took any trade secrets or confidential information of plaintiff it was not used to defendants' benefit. This plaintiff admits. Such a charge cannot rest on unfounded suspicion. If thereafter they engaged in any unfair trade practices the record fails to show it. The evidence shows compliance by the personal defendants with their obligations to plaintiff on leaving that concern and they, with the corporate defendants, have fairly met plaintiff in the "market place" in the production and sale of their products since that time. There is no evidence to the contrary.

Although we do not consider the question of unfair competition now in the case, in view of plaintiff's claim that it should affect construction of its patent claims we deem it desirable to complete the record.

■ We have heretofore set forth the law which we believe should control this case. Language in the claims should be given its usual and customary meaning. The accused structures should be viewed fairly as to the purpose served and means used in light of the question—do they infringe plaintiff's patents?

■ Because of Weimann's association with plaintiff in making application for patent 2,473,298, certain papers were submitted to him by plaintiff for execution after his employment by defendant corporations. Plaintiff claims Weimann retained certain drawings sent with the papers to him. On motion, prior to trial, defendants were enjoined from disclosure of these drawings. Later defendants secured from the Patent Office a copy of the patent application. On motion of plaintiff the injunction was extended to the patent application. Defendants did not resist the motions. This phase of the case was not further alluded to until after trial when plaintiff by brief requested these orders be made final.

These matters were germane to the case as pled on the issue of unfair competition. In view of the record there would appear to be little of a secret nature in the patent drawings (2,473,298) as of this date, by virtue of plaintiff's public exhibition, advertising and patent issued on July 14, 1949. In oral argument plaintiff's counsel so admitted. There is no evidence either that defendants committed a breach of duty or obligation to plaintiff in getting certain papers from the Patent Office. The temporary injunction orders heretofore granted plaintiff should be dissolved.

Let findings of fact, conclusions of law, and judgment be settled and submitted.