MOTOROLA, INC., a corporation,
Plaintiff,

v.

FAIRCHILD CAMERA AND INSTRU-
MENT CORPORATION et al.,
Defendants.

Civ. No. 6808 Phx. WPC.

United States District Court,
D. Arizona.

March 13, 1973.

1174

L. Engel and Daniel W. Vittum, Jr., Chicago, Ill., for plaintiff.

Brown, Vlassis & Bain, Phoenix, Ariz., John W. Barnum, Washington, D. C., Roger S. Borovoy and Nelson Stone, Mountain View, Cal., for Audrey Hogan and C. Lester Hogan.

## OPINION * AND ORDER

COPPLE, District Judge.

This case proceeded to trial on plaintiff's fifty-five page (plus attachments) Amended Complaint filed May 29, 1969. The original complaint was filed August 27, 1968. In the caption the Amended Complaint was entitled:

"Complaint for:

Unfair Competition;

Interference with Advantageous Personnel Relationships;

Antitrust Violation;

Unjust Enrichment;

Constructive Trust upon Benefits Wrongfully Obtained;

Damages—Punitive and Compensatory;

Breach of Fiduciary Duty by Officer and Director."

■ During the eight weeks consumed by plaintiff in presenting its case-in-chief some 75 witnesses were called either in person or by deposition, and approximately 560 exhibits were introduced into evidence by plaintiff. Prior to commencement of trial, by stipulation, defendants marked directly into evidence over 850 exhibits, many of which were used in cross-examination of plaintiff's witnesses and in the examination of defendants themselves when called by plaintiff for cross-examination. At the conclusion of plaintiff's case all defendants moved to dismiss pursuant to Rule 41(b), Federal Rules of Civil Procedure, on the grounds that "upon the facts and the law the plaintiff has shown no right to relief." The test, simply stated, is that if, from the record

Snell & Wilmer by Mark Wilmer, Evans, Kitchel & Jenckes by Earl H. Carroll, Phoenix, Ariz., Mueller, Aichele & Rauner by Foorman L. Mueller, Chicago, Ill., Townsend & Townsend, San Francisco, Cal., Lesher & Scruggs, Tucson, Ariz., Kirkland & Ellis by Karl F. Nygren, E. Houston Harsha, Frank Cicero, Jr., Leslie Hodson, Lewis D. Spencer, Ronald

* See 9th Cir.R.Prac. 21.

as it stands at the end of plaintiff's case, the Court is convinced that the evidence preponderates against plaintiff, the Court is empowered to grant the motion. Ellis v. Carter, 328 F.2d 573 (9th Cir. 1964). This Court is so convinced.

The basic dispute arises from the fact that in early August of 1968 eight executives of Motorola's Semiconductor Division at Phoenix, Arizona, resigned to accept employment with one of Motorola's important competitors, Fairchild Camera and Instrument Corporation, at Mountain View, California. While some of these individuals were employed in a similar capacity at Fairchild Camera's Semiconductor Division, others were employed in different and more responsible positions and some with corporation-wide responsibilities. Not all of them have remained with Fairchild Camera.

Jurisdiction is based upon 28 U.S.C. § 1332 (diversity), and 15 U.S.C. § 1 *et seq.* (Sherman Antitrust Act and Clayton Act).

The various parties are described briefly as follows:

*Plaintiff*

*Motorola, Inc.,* is a multi-division corporation with facilities worldwide. The Semiconductor Division is headquartered at Phoenix, Arizona, and in August 1968 had approximately 16,000 employees engaged in manufacture and sales of various semiconductor and related products.

*Defendants*

*Fairchild Camera* is also a multi-division worldwide operation which manufactures and sells, among many other products, semiconductor and related devices.

The late *Sherman Fairchild* was a major stockholder and director of Fairchild Camera.

*Walter Burke* was financial advisor to Sherman Fairchild and was and is an executive officer of Fairchild Camera.

*Motorola Employee-Defendants* (referred to hereinafter collectively as employee-defendants):

*C. Lester Hogan* was a director and officer of Motorola, Inc., and General Manager of its Semiconductor Division.

*Leo E. Dwork* was an officer of Motorola, Inc., and Director of Product and Operation groups within the Semiconductor Division.

*Wilfred J. Corrigan* was a Director of Product groups in the Semiconductor Division.

*Eugene A. Blanchette* was Director of Integrated Circuit operations in the Semiconductor Division.

*Thomas D. Hinkelman* was Director of Planning and Production Control in the Semiconductor Division.

*George M. Scalise* was General Manager of European Operations for the Semiconductor Division.

*Andrew A. Proscassini* was Director of Reliability Assurance and Quality Control, Semiconductor Division.

*William L. Lehner* was Manager of Equipment and Plant Operations, Semiconductor Division.

While not a named party, it is also well to mention here that *Mr. Robert Galvin* is the major stockholder of Motorola, Inc., which was founded by his father. Galvin is chief executive officer of Motorola, runs it with a strong and skillful hand and, as he freely testified, not even a division manager can implement any decision or plan with which Galvin disagrees.

Also at Motorola there is a corporate-level Financial Review Committee, sometimes in the testimony referred to as Profit Review Committee, headed by Galvin, which regularly meets with division managers to review and approve or disapprove proposed budgets and operating plans for each division and to determine funding for new projects, termination of unprofitable or unpromising

projects, etc. Their decisions in these regards are final.

Motorola Semiconductor Division is characterized by the evidence as a low-cost mass producer rather than an innovator. Fairchild Camera apparently is known more for research and development and less as a low-cost mass producer.

The semiconductor industry is a relatively new but rapidly growing field. Many new companies have been formed as a result of a spin-off of groups of executive and scientific employees from other established companies. The industry is led by bright, relatively young and highly ambitious scientists. One of its characteristics is the high mobility of top-flight employees. There is keen competition in the industry for the best men, with resulting substantially higher-than-average salaries, bonuses, stock options and other fringe benefits. All members of the industry regularly engage in advertising and recruiting in their competitors' areas of operation to attract new employees. There is a greater sensitivity among employees in this industry to higher offers and better opportunities elsewhere, with less loyalty to a particular employer, than obtains in other industries.

In mid-1968 Fairchild Camera was searching for a new corporate chief executive. A number of experienced executives were considered, some interviewed. Ultimately the attention of Sherman Fairchild was called to Hogan. When first contacted, Hogan expressed no interest in the job. Finally in late July, after the offer was made more attractive financially, Hogan agreed that if the details could be satisfactorily reduced to a written contract approved by his attorney and tax consultant he would accept. On August 7, 1968, Hogan was advised by his counsel that the contract had been agreed upon as to form and content and awaited only his signature. Dr. Hogan, that day, submitted his resignation to his immediate superior, Dr. Noble, who was Vice Chairman of the Board and Chief Technical Officer and

Group Executive, Motorola, Inc. Dr. Noble suggested that the resignation should be submitted to Mr. Galvin. On August 8, 1968, Hogan met with Galvin in Chicago. While Mr. Galvin tried with various carefully researched and prepared arguments to dissuade Dr. Hogan from resigning, he was unsuccessful and accepted Dr. Hogan's resignation at that time. At no time did Galvin advise Hogan that he had an employment contract with Motorola and, in fact, told him that he was, of course, free to resign. The following day Dr. Hogan was appointed Chief Executive Officer of the Fairchild Corporation with corporate-wide responsibilities and, in addition, as temporary General Manager of its Semiconductor Division.

During the period following Fairchild's initial offer and preceding his acceptance thereof on August 7, 1968, Dr. Hogan had discussed the offer with various persons at Motorola's Semiconductor Division, including some of the other employee-defendants, seeking their advice. Some indicated that if Dr. Hogan went to Fairchild they would be interested in going too. Dr. Hogan refused to discuss employment with any of them but did give them, at their request, the telephone number of Walter Burke at Fairchild.

Dr. Hogan, late in his negotiations with Fairchild, had told Mr. Burke that if he came to Fairchild there might be others at Motorola who would apply for jobs, and he gave Burke the names of five of the employee-defendants who might call and the general salary and option ranges they could command in the industry. Early in their negotiations Sherman Fairchild and Burke had inquired specifically of Dr. Hogan if he had an employment contract preventing him from leaving Motorola. Dr. Hogan correctly assured them that neither he nor any other employee of the Semiconductor Division had such a contract and all were free to resign at any time.

Each of the employee-defendants, except Hinkelman and Corrigan, independently and without knowledge of the ac-

tions of the others, contacted Burke, applied for employment and negotiated their own deal for compensation. Hinkelman and Corrigan learned of Dr. Hogan's resignation on August 8 or 9 and, after Hogan's employment with Fairchild, applied for jobs with Fairchild and were hired by Dr. Hogan.

There was no evidence of any "conspiracy" by defendants Fairchild Camera, Sherman Fairchild and Walter Burke to injure Motorola. They were, for good business reasons, seeking a new chief executive. While the salary and bonus arrangements were substantial, so also are such arrangements for other chief executives of large corporations.

The evidence does not lead the Court to believe or find that there was any conspiracy by Fairchild Camera, Sherman Fairchild, Walter Burke and Dr. Hogan, or any of them, to injure Motorola by enticing away its employees. Each of the seven other employee-defendants (Dwork, Blanchette, Scalise, Procassini, Lehner, Hinkelman and Corrigan) resigned from Motorola for his own individual reason; each independently applied for employment at Fairchild and negotiated his own financial deal. Some went because of friendship with Dr. Hogan and a desire to continue to work with him personally, some for the challenge of a new job. There is no evidence of any conspiracy involving these seven men or collusion for the purpose of injuring Motorola. Each knew that there was a competent and adequate replacement for his position at Motorola, and the subsequent performance of their replacements adequately bears them out.

With the foregoing general description of events the factual and legal disputes may be disposed of under the headings below.

## BREACH OF CONTRACT, INDUCEMENT and FIDUCIARY DUTY

Plaintiff, in its Amended Complaint, alleges that Dr. Hogan and each of the other seven employee-defendants were bound to their employment by Motorola for one year by written contract executed less than one year prior to August, 1968. As evidence, plaintiff cites the share option agreement. Some five months prior to August, 1968, each of said defendants had entered into a qualified share option agreement with plaintiff, consisting of a number of documents integrated into one agreement All agreements were the same and those portions relevant to the dispute are set forth below:

"MOTOROLA, INC.
RECEIPT BY OPTIONEE

TO MOTOROLA, INC.:

The undersigned hereby acknowledges receipt of Qualified Share Option Certificate No. _____, granted by the Compensation Committee on March 14, 1968, and of the following related documents:

(a) Explanatory letter from the Chairman of the Company dated March 25, 1968, concerning certain aspects of the option plan and its operation.

(b) Copy of the Share Option Plan of 1968.

(c) Copy of Rules of the Compensation Committee as adopted by the Committee on March 14, 1968.

I am aware that, by accepting the above Qualified Share Option Certificate, I am deemed to have agreed and, in consideration of the grant of such option to me, I do hereby agree to remain in the employ of the Company (or a subsidiary thereof), for a period of one year from the date of grant of such option, on the terms and conditions enumerated in paragraph seven of said rules.

_____
(Signature of Optionee)

Date: _____ "

EXPLANATORY LETTER dated
March 25, 1968

". . . (1) The option is not exercisable at all until *on and after March 15, 1969, and then only if you are and have remained continuously [sic] employed by the Company or a subsidiary*." [Emphasis in original.]

"QUALIFIED SHARE OPTION CERTIFICATE

". . . .

". . . [A]nd in consideration of the agreement of the optionee hereinafter named to remain in the employ of the company, or of a subsidiary of the company, for a period of one year from the date of grant hereof on the terms and conditions set out in paragraph 7 of said rules, the company has granted, and does hereby grant, unto _____ _____ (the 'optionee') (who at the date of this option is an employee of the company, or of a subsidiary of the company) the right and option to pur-

chase from the company an aggregate of _____ shares of the company's authorized but unissued, or reacquired common shares at and for a purchase price of . . . . "

### "SHARE OPTION PLAN OF 1968

" . . . .

**5. Price:**

The option price per share for options granted hereunder shall be determined by the committee but shall in no instance be less than the fair market value of the shares on the date of grant of such option as determined by the committee.

**6. Term of Options:**

No option granted under this Plan may be exercised prior to one year from the date it is granted.

. . . .
7. . . . .

**8. Effect of Termination of Employment or Death:**

If, prior to the first anniversary of the date an option is granted, the optionee's employment with the Company shall be terminated by the Company, with or without cause, or by the *act*, death, incapacity or retirement *of the optionee*, the optionee's right to exercise the option shall terminate and all rights thereunder shall cease. [Emphasis added.]

. . . . . . .

**14. Company's Right to Terminate Employment:**

Nothing contained herein or in any share option agreement shall restrict the right of the Company or any of its subsidiaries to terminate the employment of any optionee at any time, with or without cause, or to adjust the compensation of any optionee. *The termination of employment of any optionee, whether by the Company or otherwise and regardless of the reason therefor, shall have the results provided for herein and in his share option agreement.*" [Emphasis added.]

### RULES OF COMPENSATION COMMITTEE AS ADOPTED JANUARY 15, 1968

" . . . .

**7. Optionee's Agreement to Serve**

Each optionee as consideration for the granting of an option to him shall agree, and by acceptance of such option shall be deemed to have agreed, that he will remain in the employ of the company, or of a subsidiary, for a period of one year from the date of the granting of such option, at the pleasure of the company, or its subsidiary, and at such compensation as the company, or its subsidiary, may from time to time establish. The granting of an option shall not constitute, or be evidence of, any agreement or understanding, express or implied, on the part of the company, or any subsidiary, to employ the optionee for any definite period of time."

Plaintiff's Exhibit No. 160 at 1, 2, 5–6, 15, 16, 19, 21, 24.

■ By the clear and careful wording of this option agreement, it is not a traditional employment contract in the sense that the employee agrees to stay for a particular period and the employer agrees to keep the employee for a particular period. It says nothing more than *if* the employee stays for one year and *if* the company in its sole discretion keeps the employee for one year, then the employee shall have the right to purchase the stated shares at the option price and *pay* for them, otherwise not. The employer reserves the unrestricted right to terminate the employee or change his job or salary at any time, with or without reason and at its sole discretion. Paragraph 14 of the Share Option Plan of 1968, *supra,* clearly states the effect of the agreement:

> "[T]ermination . . . whether by the company *or otherwise* and regardless of the reason therefor, shall have the results provided for herein and in his share option agreement." [Emphasis added.]

■■ Certainly that language clearly encompasses resignation by the employee, and in any event the contract specifically provides the sole remedy— loss of the option right. The remedy specifically set forth in a contract provides the exclusive remedy. Green v. Snodgrass, 79 Ariz. 319, 289 P.2d 191 (1955); Treadway v. Western Cotton, 40 Ariz. 125, 10 P.2d 371 (1932); Armstrong v. Irwin, 26 Ariz. 1, 221 P. 222, 32 A.L.R. 609 (1923); Camelback Land & Inv. Co. v. Phoenix Entertainment Corp., 2 Ariz.App. 250, 407 P.2d 791 (1965); Deuel v. McCollum, 1 Ariz.App. 188, 400 P.2d 859 (1965); Restatement of Contracts § 235(e) (1932). Here the option agreements were drafted by plaintiff and the evidence is clear that Motorola deliberately refused to bind itself and drafted the instruments in such a way as to retain maximum flexibility in dealing even with its top executives. They cannot expect more from their employees than they were willing to give.

The Court's view of the clear meaning of the option agreement as just that, and not a contract of employment for a

fixed term, is further reinforced by the obvious fact from all the evidence that this was the uniform interpretation placed thereon by all employees signing such agreements *and by Motorola* at all times before August 1968, and since then. As each of the employee-defendants (including Dr. Hogan) were interviewed by Mr. Galvin as he tried to dissuade them from leaving, each was specifically told that he was free to go at any time and no mention (except by the filing of this action) was ever made of a *contract of employment* that would be breached by resignation.

Even after notice of the resignations, at plant meetings held by Mr. Galvin and Dr. Hogan's successor, Mr. Stephen Levy, the executive groups were still assured:

> "They [employee-defendants] are perfectly free to do as they choose as all of us are. We can accept jobs, move any time we want; we have no contracts and they elected to do this."

Mr. Galvin, testifying on behalf of plaintiff, clearly referred to the one-year statement by employee-defendants in the option agreements as signifying only the time the employee "intended" to stay with plaintiff. His position (and therefore that of plaintiff) was that it was all right for any one employee-defendant to freely leave at any time but their agreement prevented them from leaving in a "group." The Court cannot find this limitation in the option agreements.[1] Having no binding contract of employment, each employee-defendant was free to resign at any time and for any reason or no reason at all. Under the facts of this case they committed no actionable wrong in resigning as they did.

■■ Because the employee-defendants were free to leave Motorola, Fair-

child was free to employ them. A competitor is privileged to hire away an employee whose employment is terminable at will. United Aircraft Corp. v. Boreen, 413 F.2d 694, 699 (3d Cir. 1969), aff'g 284 F.Supp. 428, 442 (E.D.Pa. 1968); Harley & Lund Corp. v. Murray Rubber Co., 31 F.2d 932, 934 (2d Cir.), cert. denied, 279 U.S. 872, 49 S.Ct. 513, 73 L.Ed. 1007 (1929); Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981, 982, 7 A.L.R. 303 (2d Cir. 1918); Republic Systems & Programming, Inc. v. Computer Assistance, Inc., 322 F. Supp. 619, 625–627 (D.Conn.1970), aff'd per curiam, 440 F.2d 996 (2d Cir. 1971); Cudahy Co. v. American Laboratories, Inc., 313 F.Supp. 1339, 1347–1348 (D.Neb.1970); Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250, 262, 264, 267–268 (S.D.Cal.1958), aff'd mem., 283 F.2d 695 (9th Cir. 1960), cert. denied 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961); National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 34 (Mo. 1966); Richard M. Krause, Inc. v. Gardner, 99 N.Y.S.2d 592 (Sup.Ct.1950); Davidson v. Oakes, 60 Tex.Civ.App. 269, 128 S.W. 944 (1910); Little v. Childress, 12 S.W.2d 648, 650–651 (Tex.Civ. App.1928), aff'd, 17 S.W.2d 786 (Tex. 1929). *See also* Conmar Products Corp. v. Universal Slide Fastener Co., 172 F. 2d 150, 154 (2d Cir. 1949); National Welding Equip Co. v. Hammon Precision Equip. Co., 165 F.Supp. 788, 795–796 (N.D.Cal.1958); General Bronze Corp. v. Cupples Products Corp., 99 F. Supp. 924, 945–946 · (E.D.Mo.1950), aff'd, 189 F.2d 154 (8th Cir. 1951); Buxbom v. Smith, 23 Cal.2d 535, 145 P. 2d 305 (1944); Diodes, Inc. v. Franzen, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 25–26 (1968); Grimm v. Baumgart, 121 Ind. App. 626, 96 N.E.2d 915, 917, 97 N.E.2d 871 (1951); Coleman & Morris v. Pisciotta, 279 App.Div. 656, 107 N.Y.S.2d 715, 716 (1951); Noah v. L. Daïtch & Co., 22 Misc.2d 649, 192 N.Y.S.2d 380,

---

1. "If there is no actionable wrong as to any of the parts of what plaintiff terms a calculated plan the sum of the whole can be no

different." Cudahy Co. v. American Laboratories, Inc., 313 F.Supp. 1339, 1349 (D.Neb. 1970).

386 (Sup.Ct.1959); Taller & Cooper, Inc. v. Neptune Meter Co., 8 Misc.2d 107, 166 N.Y.S.2d 693, 699 (Sup.Ct. 1957); E. R. Squibb & Sons v. Ira J. Shapiro, Inc., 64 N.Y.S.2d 368 (Sup.Ct. 1945); Spring Steels, Inc. v. Molloy, 400 Pa. 354, 162 A.2d 370 (1960); Vincent Horwitz Co. v. Cooper, 352 Pa. 7, 41 A. 2d 870 (1945); Kingsbery v. Phillips Petroleum Co., 315 S.W.2d 561 (Tex. Civ.App.1958). As Judge Learned Hand emphatically pronounced the rule:

> "That nobody in his own business may offer better terms to an employé, himself free to leave, is so extraordinary a doctrine, that we do not feel called upon to consider it at large."

Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981, 983 (2d Cir. 1918). For a recent explanation of the rule, see Restatement (Second) of Torts § 768 (Tent.Draft No. 14, 1969) and, in particular, Comment *j*:

> "*j. Contracts terminable at will. The privilege of competition* stated in Subsection (1) *applies to contracts which are terminable at will.* Where the third person is free to terminate his contractual relation with the plaintiff when he chooses, there is still a subsisting contract relation; but any interference with it which induces its termination is primarily an interference with the future relation between the parties of which the plaintiff has no legal assurance. As to such future hopes he has no legal right, but only an expectancy; and when the contract is terminated by the choice of the third person, there is no breach of it. *The competitor is therefore free, for his own competitive advantage, to obtain such future benefits for himself by causing the termination. Thus he may offer better contract terms, as for example by offering an employee of the plaintiff more money to work for him,* or by offering [a] seller higher prices for goods, and he may make use of persuasion or other prop-
er means, *all without liability.*" [Emphasis added.]

*See also* Restatement of Torts § 768, Comment *i* (1939).

■ Because there was no employment contract to breach; because in any event Fairchild had made proper inquiry and determined that there were no such contracts; because Fairchild sought out only Dr. Hogan; and because all the other employee-defendants individually, for their own personal reasons and with no intent to injure Motorola, sought out Fairchild Camera to secure employment, the claim of wrongfully inducing breach of contract must fail as to all defendants.

Because of the Court's interpretation of the Option Agreement, *supra,* it is not necessary to discuss in this memorandum opinion defendants' other traditional legal grounds for holding that the agreement on its face does not constitute an enforceable employment contract, although they also have merit, i.e., lack of consideration, lack of mutuality, etc. These additional grounds may be covered in the findings of fact and conclusions of law as discussed in defendants' various memoranda.

■ Plaintiff alleges that Dr. Hogan and the other employee-defendants breached their fiduciary duty in leaving as a "group" to go to Fairchild Camera. Setting aside the fact that at least Corrigan and Hinkelman cannot be part of the same "group" as Dr. Hogan and the other five employee-defendants, on facts far stronger than those present here, appellate courts from numerous jurisdictions have failed to find an actionable breach of fiduciary duty. This was so in Metal Lubricants Co. v. Engineered Lubricants Co., 411 F.2d 426 (8th Cir. 1969), aff'g 284 F.Supp. 483 (E.D.Mo. 1968) (where the division manager of plaintiff's business resigned to go into competition with plaintiff and, pursuant to a prior arrangement in that regard,

**1182**

virtually all of the division's employees —including the entire sales and administrative force, except for one salesman— simultaneously resigned to join the competitor); Sarkes Tarzian, Inc. v. Audio Devices, Inc., *supra* (where Eannarino, an officer and director of plaintiff's rectifier division, *solicited* eight employees of plaintiff's rectifier division, including a research engineer, production supervisor, technical supervisor, chief quality control engineer, mechanical technician and division cost accountant and purchasing agent *prior to resigning* from plaintiff, and all left plaintiff in a group); United Aircraft Corp. v. Boreen, *supra* (where Boreen, general manager of plaintiff's Vector division and a vice-president of plaintiff, encouraged other employees of Vector to leave, resulting in eight eventually leaving); National Rejectors, Inc. v. Trieman, *supra* (where Trieman persuaded other employees of plaintiff to form a competing corporation while all of them were still employed by plaintiff and funneled business to that competing corporation); E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108 (8th Cir. 1969) (where three former employees of plaintiff, all engineers, met while still employed by plaintiff to discuss the formation of a new enterprise, and left together); Cudahy Co. v. American Laboratories, Inc., *supra* (where two former employees of plaintiff in charge of marketing and manufacturing of an animal by-products processing plant notified plaintiff's customers of their intent to leave plaintiff and to go into direct competition with plaintiff while still under plaintiff's employ). *But see* American Republic Ins. Co. v. Union Fid. Life Ins. Co., 295 F. Supp. 553 (D.Ore.1968).

Plaintiff relies heavily in this area on Bancroft-Whitney v. Glen, 64 Cal.2d 327,

411 P.2d 921, 49 Cal.Rptr. 825 (1966). Without discussion, it need only be said that *Bancroft-Whitney* is clearly distinguishable on its facts.

In the case at bar there is no evidence of malice or bad faith showing intent to leave Motorola in a position where it could not function because key employees had left.

Plaintiff also complains that in the months after August 1968, other employees at various lower levels moved from Motorola to Fairchild Camera. Suffice it to say that as to these employees, each had his own personal reason, none were wrongfully recruited by defendants and it constituted no more than normal employee movement within the field of their skills.[2] Many have since moved on from Fairchild, some back to Motorola. There is no evidence of any disproportionate hiring by Fairchild of Motorola employees even if that alone were actionable.

■ One comment remains to be made. The Court is troubled by the act of Dr. Hogan in revealing to Walter Burke the "range of compensation five of the employee-defendants could command in the market place" while still an officer and director of plaintiff. While this cannot be said to comport with his fiduciary obligation, nevertheless in the context of this case it was not the proximate cause of any damage to plaintiff. *See* discussion *infra*; *cf.* Cudahy Company v. American Laboratories, *supra*.

## ANTITRUST AND UNFAIR COMPETITION

■ The Court can find no facts which would support a claim under the antitrust laws on any theory, nor which

2. It seems clear to the Court from the testimony of Mr. Galvin that the primary reason for filing this action was to inhibit the freedom of other employees who might be desirous of leaving Motorola to take employment with a competitor. Never before or since this action has Motorola sued other executives who also resigned during their one-year option period either for breach of contract or for a "trade-secrets" injunction.

would support a claim for unfair competition.

## CLAIMS RELATING TO TRADE SECRETS

Plaintiff alleges a general conspiracy among the defendants to injure plaintiff and profit defendants through misappropriation of plaintiff's trade secrets.

■■■ At the time of their resignations each Motorola employee-defendant had in effect an agreement with plaintiff regarding disclosure of trade secrets which provided in pertinent part as follows:

"2. That I will maintain strictly confidential during my employment all data and information of the company which I may originate or of which I learn during my employment with the company and which is of a confidential or secret nature such as product, machine, and process developments, whether patentable or not patentable, manufacturing 'know-how' and specifications, cost and pricing practices, customers' lists, records of customers' requirements and usages, personnel records, company financial records, and the like; and upon termination of my employment with the company for any reason whatsoever, I will not take with me or remove documentary material of the company on such data and information, or any record or copy thereof.

"3. That for a period of two (2) years after such termination I will not disclose or use such data and information of paragraph 2 above, unless I first receive written approval to do so from an executive officer of the company, or *unless said data and information becomes generally available to the public through the issuance of patents thereon or through the publication of articles fully describing the same,* or unless I discover and can establish by documents or publications that it was known publicly before I originated or

learned of the same at the company. I agree that during my employment I may originate or learn of such data and information through visual, oral, or documentary means. I believe that the obligations in these paragraphs 2 and 3 are fair and reasonable, and are essential for the protection and orderly management of the company. With respect to any such data and information which is in a physical or documentary form, it is agreed that the obligations in these paragraphs 2 and 3 are binding upon my heirs, executors and administrators, and may be transferred by the company." [Emphasis added.]

Plaintiff's Exhibit No. 160 at 26.

Under the facts here, California law governs in this area. Sarkes Tarzian, Inc. v. Audio Devices, Inc., *supra.*

There is no claim that any Motorola employee-defendant took with him any blueprints, invoices, customer lists, price lists or written or printed data of any kind belonging to plaintiff.

It was clearly established that Fairchild Camera regularly (both before and after August 1968) purchased and studied all domestic and foreign patents as well as relevant trade literature and competitors' sales and promotional literature and products. The same purchase, study and analysis of competitors' newly marketed products is also a regular and customary practice by all engaged in this highly competitive industry. Because of the rapidly changing technology in this explosive industry it is apparent that such a practice is necessary for survival. Also, with regard to patent disclosures, neither the law nor the above-mentioned nondisclosure agreement limits the "patents" to domestic ones only.

Defendants contend that all of plaintiff's claimed trade secrets in issue at trial were either fully disclosed by patents, domestic or foreign, issued prior to August 1968; or were generally known in the trade and not secrets in fact; or

**1184**

were disclosed in publications prior to August 1968; or are not in fact used by Fairchild Camera; and further that there is no evidence in any event that any particular Motorola employee-defendant disclosed any or all of them.

The following general guiding principles as to the law of trade secrets may be stated:

"If . . . it appears that there were in fact no trade secrets or data [so treated], . . . then no ground for an injunction exists." Scavengers' Protective Ass'n v. Serv-U-Garbage Co., 218 Cal. 568, 24 P.2d 489, 491 (1933); *accord,* Sarkes Tarzian, Inc. v. Audio Devices, Inc., *supra.*

"In every case where the plaintiff seeks protection for a trade secret, it must appear that. it really is secret. If a so-called secret process is known to others in the trade, no one will be enjoined from disclosing or using it." Lessner Dental Laboratories, Inc. v. Kidney, 16 Ariz.App. 159, 162, 492 P. 2d 39, 42 (1971), quoting Ridley v. Krout, 63 Wyo. 252, 180 P.2d 124, 130–131 (1947).

"[A] substantial element of secrecy must exist, so that, except by the use of improper means, there would be *difficulty* in acquiring the information." Restatement of Torts § 757, Comment *b*, at 6 (1939) (emphasis added); *accord,* Sarkes Tarzian, Inc. v. Audio Devices, Inc., *supra.*

"Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret." Restatement of Torts § 757, Comment *b*, at 5–6 (1939).

As summarized by Judge Yankwich after lengthy discussion in Sarkes Tarzian, Inc. v. Audio Devices, Inc., *supra,* 166 F.Supp. at 265 (emphasis added, footnotes omitted):

"Trade practices, to come within the obligation of secrecy must be secret. While they need not amount to invention, in the patent law sense, they must, at least, amount to discovery. It follows that matters which are generally known in the trade or *readily discernible* by those in the trade cannot be made secret by being so labelled in an agreement."

█ Criteria to consider in determining whether given information is a trade secret are:

"(1) the extent to which the information is known outside [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." Restatement of Torts § 757, Comment *b*, at 6 (1939); *accord,* Metal Lubricants v. Engineered Lubricants, 411 F.2d 426 (8th Cir. 1969).

Originally there were 140 different alleged trade secret items (covering virtually every step in the semiconductor manufacturing process) in issue in the litigation, as set forth in plaintiff's answer to defendants' interrogatories filed September 6, 1968. Of these original 140 alleged trade secret items, 134 were voluntarily dropped from the case prior to trial, leaving only six: Nos. 6, 23, 24, 71, 95 and 97. On June 26, 1970, Motorola added three new items, Nos. S–1, S–2 and S–3. On February 8, 1971, Motorola added the final and tenth alleged trade secret item introduced at trial, No. S–4.

As categorized by plaintiff, the remaining ten alleged trade secrets relate to the manufacture of two discrete de-

vices—the plastic encapsulated TO–92 (Items 6, 23, 24, 71 and S–4) and the aluminum packaged TO–3 (Items S–1, S–2, S–3, 95 and 97).

While the Motorola employee-defendants had executed the above-mentioned nondisclosure agreement, they were not advised upon execution, either generally or specifically, what, if any, production processes, know-how, or other things plaintiff considered proprietary. At no time during their employment were they so advised. Upon their termination attention of each was called to the existence of the trade-secret agreement. Even in view of the knowledge by plaintiff that they were accepting employment with a competitor, however, they were not advised either generally or specifically what plaintiff considered to be covered by the restrictive nondisclosure agreement. Indeed, the conclusion is inevitable that Motorola did not know what it so considered. The evidence established that there was no list or index of any kind in existence in Motorola's records, or in the records of their learned patent counsel who was privy to all their patent and alleged trade-secret information, as to what plaintiff considered to be a proprietary trade secret. The evidence also established that in other similar companies in the same industry such restrictive agreements were implemented by furnishing the employee a list of employer-claimed secrets at the time of employment; during employment as additions or deletions were made; and at termination by requiring a signed document acknowledging specifically identified and claimed trade secrets.

In E. W. Bliss Co. v. Struthers-Dunn, Inc., 408 F.2d 1108 (8th Cir. 1969), a case on facts similar to those here, the Court of Appeals, in setting aside an injunction issued by the lower court which specified general areas or fields of production and product lines in which the employee-defendants could not be employed by the defendant employer, stated, *id.* at 1114:

"The lower court appears inclined to let the defendants reach the legal conclusion that a particular design concept is a 'trade secret' of Eagle. These defendants would then be able to test their legal opinion on the law of trade secrets and their technical opinion on the state of the prior art in a proceeding to show cause why they should not be held in contempt. We feel that the vagueness of this section, even when read in the context of the entire injunction [specifying various 'fields of solid state engineering'], places an unduly harsh burden on the defendants, especially on Struthers [the new employer] which is presumed to know all the confidential technical information of Eagle . . . ."

The same principle of undue burden and overbreadth would seem to apply to the contract here so as to make it unenforceable without specific advice at some time to employees as to specific trade secrets claimed or some evidence (of which there was none here) from which the Court could find that the employee should know a secret of which his employer did not specifically advise him.[3]

---

3. As it is not a restrictive employment contract, the trade secret agreement can only affirm the intent of the parties to be bound by the common law of trade secrets. 2 R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies § 51.2(c), at 362 (3d ed. 1968). While state law governs this area generally, conflicts with the federal law of antitrust and patents must be resolved in favor of the latter. This holding, and those in the *Bliss* and *Metal Lubricants* cases, *supra*, must be read as a partial response to the unanswered question of "the extent, if any, to which the States may properly act to enforce the contractual rights of inventors of unpatented secret ideas," raised by the Supreme Court. Lear, Inc. v. Adkins, 395 U.S. 653, 675, 89 S.Ct. 1902, 1913, 23 L.Ed.2d 610 (1969). *See also* Blonder-Tongue Lab., Inc. v. University of

No contract existed between plaintiff and its former employee-defendants restricting or limiting their employment in the same industry following termination.

Particularly appropriate in this case is the principle that the protection allowed trade secrets "is not a sword to be used by employers to retain employees by the threat of rendering them substantially unemployable in the field of their experience should they desire to resign. This shield is not a substitute for an agreement by the employee not to compete with his employer after the termination of employment." E. W. Bliss Co. v. Struthers-Dunn, Inc., *supra,* at 1112–1113.

■■■ It is further the conclusion of the Court that plaintiff's trade secret claims must fail because as to those in issue at trial no real effort was made by plaintiff prior to trial to keep them secret. They were also either revealed in the marketed product; fully disclosed by issued patents; generally known to those skilled in the industry or trade; or consisted of information easily acquired by persons in the industry from patents, literature or known processes freely available as of August 1968, and in any event prior to any shown use by Fairchild Camera.

From 1965 on and even after 1968 plaintiff's employees regularly conducted tours of the entire TO–92 production line involving that group of claimed trade secrets. Among persons toured were customers (some of whom were also competitors in this same product), employees of competitors being considered for employment or attempting to be recruited by plaintiff, and on at least one tour Mr. Fred Kuliche of Kuliche & Soffa (builders of commercial manufacturing equipment of the TO–92 line type claimed as a trade secret) which ultimately built the Fairchild Camera production equipment complained of.

There were no signs in the area warning of trade secrets, no warnings given to those taking the tours, and no statements regarding nondisclosure required to be signed or acknowledged. Persons taking the tour could observe, time, and inquire of operators as to the speed of machine operations and receive honest answers; could operate one of the "secret" machines and observe its "secret" process in a separate microscope placed there for this purpose. The line tour disclosed the sequence of manufacturing steps and for a careful observer, knowledgeable in the industry, little would be left unknown following such a tour of the TO–92 group of claimed trade secrets. As testified on cross examination by Dr. Petritz, plaintiff's trade secret expert:

"Q. Isn't it true that if a line is important enough that you want to keep it secret you don't even tour people through the area?

"A. Yes."

Plaintiff also entertained a reporting team from Electronic Procurement Magazine, permitted them to tour and photograph the TO–92 line, resulting in a picture article entitled "Photo Tour of Motorola Plastic Transistor Plant" in its August *1965,* issue, describing the general nature of its TO–92 line with photos of some of the items claimed to be secret.

Ill. Found., 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971) ; Sears, Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964) ; Compco Corp. v. Day Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964) ; Troxel Manufacturing Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (6th Cir. 1972) (public policy favors early attack on protected ideas), *noted,*

7 Ga.L.Rev. 189 (1972) (*Lear* & progeny require state law to give way to federal free competition principles in every instance). Actual notice of items claimed to be trade secrets is such a principle. *But see* Dekar Ind., Inc. v. Bissett-Berman Corp., 434 F.2d 1304 (9th Cir. 1970), cert. denied, 402 U.S. 945, 91 S.Ct. 1621, 29 L.Ed.2d 113 (1971).

Plaintiff also produced two movies: one prior to filing the lawsuit, and one after, which were generally shown in the trade and revealed to the skilled observer substantially all of alleged trade secret 71 of the TO–92 group.

Aside from the fact that plaintiff did not know at the time of filing this action what trade secrets it possessed and failed to take any reasonable steps to protect their secrecy, the TO–92 group of claimed secrets were disclosed as to the various individual steps in Motorola's own patents issued prior to August 1968. The fact that Motorola had established a high-speed, straight-line production program for the TO–92—and therefore it could be done—was well known in the industry long before August 1968. The succession and order of manufacturing and testing steps from crystal pulling to packaging was dictated by the nature of the product and necessarily followed by everyone in the industry.

The Ferranti Company in Europe had in operation a high-speed, almost completely automated straight-line production program in 1967 almost identical in every respect to plaintiff's and which was described in detail in their sales literature distributed to the trade in 1967. Most devastating to plaintiff's case, however, was the testimony of their own trade secrets expert, Dr. Petritz, on cross examination (there was no re-direct examination of this witness) that every step of claimed trade secret 71 (of the TO–92 group) was fully disclosed or necessarily implied in the Helda-Lincoln and Lehner patents;[4] that as to claimed trade secret No. 6 of that group the procedure was described in the Da Costa patent, the significance of the process for high-speed production was disclosed in the Lehner patent, and Fairchild Camera uses a different technique than Motorola anyway; that claimed trade secret 23 of that group is disclosed in the Lehner patent (the Ferranti literature and Motorola tours as well as the above-mentioned movies disclose the same matters and procedure).

As to claimed trade secret S–4 of the TO–92 group, it was generally known in the industry prior to August 1968, and Fairchild does not follow the Motorola steps anyway. There may be some significance here to the fact that this was not even claimed by Motorola to be a trade secret until more than two years after the suit was filed in spite of its blanket claim of 140 items made shortly after this action was filed.

With regard to the TO–3 group of claimed trade secrets: Item 96 was fully disclosed in the Robinson and Boczar-Davis patents. Item 97 is one of the "cook-book" of cleansers, is no longer used by plaintiff and simply does not rise to the level of a "trade secret." Item S–1 when marketed disclosed the materials used (everyone in the industry regularly examines competitors' marketed products for just such purposes) and together with the disclosures of the Robinson and Boczar-Davis patents eliminates any secrecy. Items S–2 and S–3 were generally known in the industry prior to August 1968, were in pilot production at Fairchild Camera prior to August 1968 (using identical epitaxial processes) and are also fully disclosed in the Robinson and Boczar-Davis patents.

There was also testimony at trial (although not mentioned in post-trial memoranda) of the marketing by Fairchild Camera of a device labeled MPS–6500, being a duplicate of plaintiff's device la-

4. The following patents with their issue dates are referred to hereinafter. Four of them as noted were issued or assigned at issuance to Motorola.

| | Patentee | Foreign | | United States |
|---|---|---|---|---|
| | Robinson | Great Britain | 12/67 | 12/68 |
| (Motorola) | Helda-Lincoln | Holland | 12/66 | 12/68 |
| " | Boczar-Davis | Italy & France | 5/26/67 | 3/69 |
| " | Da Costa | | | 6/62 |
| " | Lehner | France | 9/67 | 3/69 |

beled MPS–6500. Plaintiff claimed MPS means Motorola Plastic Semiconductor—defendants claimed it means Moulded Plastic Semiconductor. Both devices were interchangeable in use. There was no evidence of actual confusion by customers, presumably because each Motorola device carried its batwing M logo in addition to the MPS–6500 designation, and each Fairchild device carried its block F stamped logo. All third-party catalogues introduced clearly indicated to any prospective buyer the manufacturing source.

While each Motorola employee-defendant came from a different area of expertise and knowledge at Motorola, there was no evidence from which the Court could find that any particular defendant disclosed any particular information. The closest was the claim that Lehner, who had supervised design and in-house construction of production equipment at Motorola, ordered TO–92 line production equipment from Kuliche & Soffa for Fairchild Camera. There is no evidence that he did more than list ultimate performance criteria for production equipment using a different and Fairchild-patented vertically processed (as opposed to plaintiff's similar horizontally processed) lead frame strip for the Fairchild TO–92 line. The equipment was then designed and built by Kuliche & Soffa and sold to Fairchild for a substantial price. As noted above, the *methods* for performance from which the machines could be independently designed was available from patent and other literature and information readily available in the trade. No one from Kuliche & Soffa was called to testify at the trial regarding the source of their information used in the design and construction of the production line equipment.

As discussed above, plaintiff's trade secrets claims must fail because of lack of implementation of the general trade secrets agreement; because plaintiff did not take reasonable steps to protect its trade secrets and, in fact, did not even know what it was intending to claim; because some were clearly revealed in the marketed product; and because substantially all of the claims were revealed in patents and trade literature or generally known in the trade prior to August 1968, and therefore excepted from restriction under the specific terms of the agreement, and under trade secret law.

## DAMAGES

While the foregoing indicates the Court's view that the motion for dismissal must be granted because of lack of proof of liability, the Court further finds that plaintiff has failed to establish by any credible evidence that plaintiff suffered any damages proximately caused by the events of August 1968.

The evidence clearly shows that Dr. Hogan and each of the other employee-defendants was promptly replaced by an understudy (in the case of Dr. Hogan, by Mr. Stephen Levy who had been selected by Mr. Galvin and trained in direct anticipation of Dr. Hogan's eventual resignation) whose subsequent performance was equal to or better, as shown by the overall actual Division performance, than that of the departing employee. It is difficult, in any event, to believe that the departure of eight executives from a 16,000 person organization, closely supervised and controlled by Mr. Galvin, Dr. Noble and the Financial Review Committee, and with Motorola's depth of proven management talent and available corporate executives, could cause the tremendous damages claimed in the complaint.

The Division's gross sales and net profit picture for the period August 1, 1968, to the end of that year was comparable to the prior portion of the year, with no significant changes that could be charged to the resignations. The year 1969 set all-time records for the Semiconductor Division in gross sales and net profits. This was explained as the result of a short-term "we'll show them" attitude that couldn't last. How-

ever, during the very serious industry recession period of 1970–71 Motorola's performance was exceptional and far better than Fairchild Camera's. From August 1968 to the date of trial in mid-1972 Motorola's unit costs continued a steady decline, and sales, profits and total market share continued a steady climb.[5] Motorola witnesses could only speculate that it might have been better if the employee-defendants (which one or ones?) had remained. By comparison, however, Fairchild Camera, which now had these employee-defendants, made no comparable record. In fact, as some indicator at the time of trial (after short swings in the stock price of each corporation for a brief period after August 7, 1968), Motorola's stock was selling at almost double its August 1, 1968, price (after accounting for a two-for-one stock split), while Fairchild Camera's stock was some 20% below its August 1, 1968, price.

Mr. Galvin, expressing his opinion as to how to measure the claimed loss to Motorola caused by the departure of the employee-defendants, pointed to an alleged decrease, subsequent to August 1968, in net profits as a percentage of gross sales. However, there were a number of factors shown by the evidence which would be beyond the control of the employee-defendants and did account for such a change; e. g., increased freight costs due to expanded overseas operations; increased depreciation charges due to expansion of capital assets; increased general competition and resulting changes in product price and pricing policies; the 1970–71 recession and its effect also on product price and pricing policies as well as increased inventory write-off; the sharply contracted market caused by the recession; and increased corporate overhead allocations. It is interesting to note that the evidence shows continuing decreased *direct* labor costs even in view of increased wage rates to such labor. The severe layoffs due to the recession period is an additional factor in this area which could not have been avoided by Dr. Hogan and the other employee-defendants.

Individual product managers were called to testify as to decisions made to terminate certain Research and Development projects and product lines as being bad business decisions that Dr. Hogan would not have made. All such complaints turned out to be decisions to terminate their pet projects, made by Mr. Galvin and the Financial Review Committee after consultation with Mr. Stephen Levy (Hogan's successor), to meet the problems of the very serious 1970–71 business recession in the semiconductor industry and in order to cut costs and maximize profits. In view of Motorola's overall performance during this period, plaintiff fails to demonstrate that such decisions were improper or that they would have in any event been different had Dr. Hogan and/or any of the other employee-defendants still been there.

As stated elsewhere, the Court, after reviewing all of plaintiff's evidence, is still of the same opinion as it was at the conclusion of plaintiff's case-in-chief that if the proof shows anything it is that Motorola had profited from the events of August 1968, but Fairchild Camera, Sherman Fairchild and Walter Burke had not at the time of trial. None of the employee-defendants (except for Dr. Hogan's below-market price option) ever exercised their original Fairchild qualified stock options because the shares dropped to below the option price and stayed there. There is no evidence that Burke or Sherman Fairchild ever profited from the Fairchild Camera stocks' short upswing following August 7, 1968.

To establish an alternate theory of damages plaintiff enlisted the aid of Dr. Rensis Likert. Dr. Likert has conducted extensive studies upon the most effective style of management and has authored books and articles in this area.

5. See Appendix.

Here he was asked to express an opinion as to monetary damages suffered by plaintiff's human organization. He had never computed nor testified on this specific subject before but stated he had been working on the methodology for doing so.

He testified that he had not based his opinions on the actual facts of Motorola's management performance subsequent to August 1968, and apparently neither knew nor wanted to know such facts. This was true, the Court presumes, because as Dr. Likert repeatedly indicated he was expressing his opinions on the basis of *probabilities* only. The actual facts as demonstrated at the time of trial by the evidence of division profit performance, unit-cost reduction and relative market share increase belie the witness's opinion testimony as to what "probably" would happen.

Further, the whole point of the witness's research and conclusions in the area of comparative management styles demonstrates that a "democratic" style of management is more efficient (and profitable) than an "autocratic" style. The evidence is clear that Dr. Hogan's was an autocratic style and his successor's was a democratic or participatory style as those terms were used by Dr. Likert.

 The Court finds Dr. Likert unqualified to express the opinions given; and that his testimony was inconsistent, inherently improbable, and conflicts with the actual facts as to claimed damages proximately caused by defendants.[6] The other objections to this testimony raised by defendants, although valid, need not be discussed.

If anything, Dr. Likert's testimony, when taken with the factual history of Motorola's performance subsequent to August 1968, as compared to the industry as a whole, would indicate that Motorola profited and Fairchild Camera lost by the events complained of which resulted in a change of the style of Division management from an autocratic one to a more democratic style under Mr. Levy.

## CONCLUSION

It is the conclusion of the Court that the evidence at the close of plaintiff's case demonstrates affirmatively a lack of liability and lack of damages (other than usually attends employee resignations which is a normal cost of doing business by any employer in a free society) chargeable to the defendants or any of them under any theory advanced by plaintiff by pleading or proof.

The foregoing opinion has been written in general terms to respect the order of confidentiality entered herein and the confidential trade and financial information of all parties. Detailed findings of fact and conclusions of law will be sealed in accordance with the confidentiality order previously entered.

It is ordered:

1. Defendants' motion to dismiss the complaint and action with prejudice pursuant to Rule 41(b) Fed.R.Civ.P. as to all defendants is granted, defendants to recover their taxable costs.

2. Not later than sixty (60) days hereafter counsel for the defendants will lodge with the Court findings of fact (with transcript references) and conclusions of law (with citations) and a form of judgment consistent with the foregoing.

3. This Opinion and Order will not be subject to the confidentiality order previously entered herein, but Findings of Fact and Conslusions of Law lodged or filed hereafter will be sealed by the Clerk and released to others than the parties and their counsel only by order of the Court.

---

6. "It is the rule of the federal courts that oral, uncontradicted testimony may be disregarded if there are in it inconsistencies, or inherent improbabilities or undisputed facts contradict it. Quock Ting v. United States, 1891, 140 U.S. 417, 420–421, 11 S. Ct. 733, 35 L.Ed. 501; Grace Bros. v. Commissioner of Internal Revenue, 9 Cir., 1949, 173 F.2d 170, 174."
Sarkes Tarzian, Inc. v. Audio Devices, Inc., *supra*, 166 F.Supp. at 269, n.62.

APPENDIX

The following appeared in a Phoenix newspaper during trial and was the following day stipulated into evidence as Defendants' Exhibit 202:

## FIRM AIMS AT DOUBLE VOLUME

# 5 Motorola Divisions Note 'Upbeat' In Sales, Earnings

### Special to The Gazette

CHICAGO—Motorola's five operating divisions are all "in an upbeat mode" with increases in sales and earnings predicted for 1972, William J. Weisz, president of the diversified electronics firm, told financial analysts here.

Among year-to-date increases cited by division managers were color TV, 50 per cent; black and white TV, 80 per cent; automotive products, 15 per cent-plus.

Government electronic division sales and earnings are up, with a backlog up nearly 10 per cent since year-end *and semiconductor products division total bookings are up more than 25 per cent.* The communications division for the first four months achieved a sales increase of approximately 19 per cent over 1971, with a greater profit growth.

"We expect the domestic economy to continue its improvement and are presently estimating increased sales and earnings for 1972 in all of our divisions, with the company passing the $1 billion sales level this year," Weisz said.

"The statistics are impressive, ["] he said, but noted, "We do not expect to continue these very high year-to-year comparisons throughout the whole year in all activities if for no other reason than 1971 got better as the year went on.

"There may be changing conditions in some market places; there remain some uncertainties regarding the international economy and the Vietnam war," he added.

*The firm's goal is to double sales volume, with a commensurate increase in earnings, within five to seven years,* he said, but added that all industrial concerns will face increased would [sic] competition, increasing nationalistic attidudes [sic], toughening era of government regulations, bias against big business and consumerism.

Only those companies with "distinctive competences" in management capability, flexibility to changing conditions, and selectivity in areas of endeavor "will grow and prosper," Weisz concluded.

Phoenix (Ariz.) Gazette, June 6, 1972, at 20, col. 1 (emphasis added).